```
          IN THE UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF TENNESSEE
                 NASHVILLE DIVISION

MARGARET CRAIG, as next of      )
kin and personal                )
representative of the estate    )
of Angela Hulsey,               )
                                )
        Plaintiff,               )
                                )
                                )
                                )   No. 3:17-cv-01335
vs.                             )   JURY DEMAND
                                )   JUDGE CAMPBELL
                                )   MAGISTRATE HOLMES
                                )
CHEATHAM COUNTY, TENNESSEE,     )
BEN MOORE, MARK BRYANT,         )
STEPHANIE GIZZI-BELL, JESSICA   )
PLANK, et al.,                  )
                                )
        Defendants.             )
```

_____

**The Deposition of**

**MARK MITCHELL BRYANT**

**January 14, 2019**

_____

```
        Penny Townsend Morrison, RMR, LCR, CCR
              Accurate Court Reporting
                The Pilcher Building
                  P.O. Box 682683
                 Franklin, TN  37068
              (615) 244-DEPO or 244-3376
                 www.ACR-Nashville.com
```

1  kind of odd jobs you had in high school.
2       A.   Okay.  Started as an assistant manager at a
3  car wash after high school.
4       Q.   And just generally what years?
5       A.   '96, '97.
6       Q.   All right.
7       A.   Then got into construction labor.
8       Q.   All right.  Generally what years?
9       A.   '97, '98.
10      Q.   All right.
11      A.   Then I got a job at Lowe's, '98, '99.
12      Q.   All right.
13      A.   Nashville Sash & Door, '99, 2001.  Back to
14 construction from 2001 to 2008.  '08 to '12, 84 Lumber.
15 That was a construction supervisor.
16      Q.   You said '08 until when?
17      A.   '12, approximately.  Then 2013, went to work
18 for TDOC.
19      Q.   All right.
20      A.   2015, went to work for Cheatham County, and
21 that went to 2017, September.
22      Q.   All right.
23      A.   That's it.
24      Q.   And so have you had any employment since?
25      A.   Yes.  Currently, I work for a company called

```
 1        Q.   You started work in 2015, and your class --
 2        A.   Well, yeah.  You're right.  You're right.  It
 3   was, you know, February or March of 2017, so yeah.
 4        Q.   And you hadn't had a first aid or CPR class
 5   working with Cheatham County prior to 2017?
 6        A.   I did with the State, but not at Cheatham
 7   County.
 8        Q.   Okay.  Is that a yearly certification?
 9        A.   I'm not sure.
10        Q.   How often would you have to deal with -- since
11   it's a jail, I may use the term "inmate."  I may use the
12   term "detainee."
13        A.   Sure.
14        Q.   I think generally we're talking about the same
15   thing.
16             But how often would you have to deal with an
17   inmate or detainee who needed medical assistance at
18   Cheatham County Jail?
19        A.   Like you want a specific number?
20        Q.   If you can provide it.
21        A.   That would be impossible, but a dozen?  A
22   dozen times over my two years I had to respond to a
23   medical...
24        Q.   And are you considering that like a medical
25   emergency situation or --
```

1  A. It might be perceived to be at first, but
2  then, you know, you figure it out.
3  Q. Okay. But in dealing with inmates that need
4  medications and that sort of thing, was that a daily
5  thing?
6  A. Yeah, sure. We passed out meds every evening.
7  Q. Did you ever take vital signs for inmates?
8  A. Sure.
9  Q. How often would you do that and under what
10 circumstances?
11 A. Really, whenever they requested it. If an
12 inmate was saying they were feeling some kind of way
13 about whatever, we would always take the vitals before
14 we called the nurse, just so we were ready, you know, so
15 we didn't have to waste a lot of time.
16 Q. And what was the process then? I assume you
17 have some equipment at the jail that --
18 A. Yeah. We had it all in a bag. It was a
19 digital BP.
20 Q. That's blood pressure?
21 A. Yes, sir.
22 Q. All right.
23 A. An electronic thermometer that we ran across
24 their forehead, pulse oximeter that went on the finger.
25 And I think that's it.

1  Q. And would you take all three of those
2  vitals --
3  A. Yes.
4  Q. -- every time?
5  A. Yes.
6  MS. CRANE: Make sure you let him finish all
7  the way to make it cleaner.
8  THE WITNESS: I'm sorry. So sorry.
9  Q. (By Mr. Moseley) You're fine. When you'd
10  take the vitals, what would you do with that
11  information?
12  A. Normally we would have some scratch paper in
13  that bag or we would carry some, and we'd make a note of
14  whatever that information was. If it was something that
15  needed to be documented, we would document it. If it
16  was within the normal realm, that scrap would go in the
17  trash.
18  Q. All right. And how would you document it?
19  A. Logbook. If it was elevated, leave a note for
20  the nurse on her desk. Sometimes she would ask us to
21  leave a note, especially if she had told us to give
22  medication so she could update the files when she came
23  in the next day.
24  Q. Could it be a note for the nurse, logbook, or
25  both, or would it just be one or the other?

```
1        A.   I don't know that there really was a policy
2   for it or if there was any set rules.  It was just one
3   of those things that if it was necessary to pass on the
4   information, then we would.
5        Q.   Okay.  But if you left a note for the nurse,
6   it wasn't also always going to be in the logbook?
7        A.   True.  And, again, this is the way I would
8   have done it.  Somebody else might have done it
9   differently.
10       Q.   All right.  Did you receive a policy and
11  procedure handbook from the jail?
12       A.   I got a thumb drive that I was told to use on
13  my own.
14       Q.   All right.  Did you?
15       A.   Yeah, of course.
16       Q.   Did you have to sign off saying you had read
17  it?
18       A.   I don't remember.  I don't know.
19       Q.   Some places require that.
20       A.   Yeah.
21       Q.   Okay.  The dozen or so that you mentioned
22  earlier of times that you had to deal with somebody that
23  needed medical help, would that have been times that you
24  would have had to call either a doctor, a nurse, 911,
25  ambulance, that sort of thing?
```

1  Q. Do you know if there was any training provided
2  for what observations to make and how to log those
3  observations?
4  A. Common sense.
5  Q. How often would an inmate or detainee's vital
6  signs have been taken while they're on med watch?
7  A. Usually per the inmate's request if they were
8  feeling some kind of way, you know, depending on the
9  situation.
10 Q. All right. Is there a set frequency absent a
11 request?
12 A. Not to my knowledge, unless we were instructed
13 by medical to do it, you know, every hour on the hour or
14 something, but I don't remember ever getting that kind
15 of directive.
16 Q. Did you ever not take all the vital signs for
17 an inmate or detainee when you took vitals?
18 A. Not that I can recall.
19 Q. And if vitals were taken, was that always
20 either logged or communicated to medical staff?
21 A. Only if it was above the norm.
22 Q. All right. Do you know what a normal blood
23 pressure is?
24 A. 120 over 80.
25 Q. Is that the same for everyone?

1  somebody's temperature being high?
2       A.   I think we actually had a memo.  100.5 was
3  considered high and warranted a call to medical.
4       Q.   Okay.
5       A.   If she wasn't on call -- if she wasn't
6  on-site.
7       Q.   Did you have any direction about a low
8  temperature?
9       A.   No, not that I recall.
10      Q.   If somebody had a high temperature or even a
11 low temperature, would you consider that a serious
12 medical condition?
13           MR. DEDMAN:  Object to the form.
14      A.   Depending on how high or how low.
15      Q.   (By Mr. Moseley)  All right.  So anything
16 above 100.5?
17      A.   Not necessarily.  100.5 was just that number
18 where we were supposed to call the nurse and let her
19 know about it.
20      Q.   What point does it become serious?
21      A.   I wouldn't know.  105?  I don't know.
22      Q.   All right.  Did you have any medical training
23 prior to working for TDOC?
24      A.   No.
25      Q.   Is a high or low blood pressure, higher or

```
1    someone is suspected to be withdrawing from drugs is not
2    enough --
3         A.    No.
4         Q.    -- to warrant a call to medical.  Is that
5    correct?
6         A.    That's correct.
7         Q.    Okay.  Did you know -- getting specific about
8    Ms. Hulsey now.  Did you know Ms. Hulsey prior to
9    October 2016?
10        A.    Not that I'm aware of, no, sir.
11        Q.    So you didn't have any other interaction with
12   her if she was a prior detainee or anything like that,
13   to your recollection?
14        A.    Not that I recall, no, sir.
15        Q.    What is the first recollection you have of
16   Ms. Hulsey in October of 2016?
17        A.    Of the night I brought her up to booking, took
18   her vitals, and put her on med watch.
19        Q.    Do you know what night that was?
20        A.    I believe it was the 11th, October 11th.
21        Q.    Okay.  What's your recollection of that night?
22        A.    There was a call over the intercom, I believe,
23   from one of the other inmates to the effect that there
24   was some kind of medical emergency.  I don't remember if
25   I went back there by myself or if somebody went before
```

1  me. I just know when I got there she was laying on her
2  bunk.
3        I believe I asked her if she was okay. She
4  was talking to me. I think I helped her up from her
5  bunk. She said she was in pain, felt weak. I escorted
6  her to booking and sat her in a chair and took some
7  vitals.
8        Q. All right. Do you recall what those vitals
9  were?
10       A. They were within normal.
11       Q. Did you log those in any form? Do you know?
12       A. Not that I recall.
13       Q. Did you call the nurse?
14       A. Yes, sir.
15       Q. What did you tell the nurse?
16       A. That Ms. Hulsey was complaining of some pain.
17 She wasn't feeling right.
18       Q. Anything else?
19       A. No, not really. Not that I remember. I just
20 know that she just didn't feel good. My assumption was
21 detox symptoms.
22       Q. Did you communicate that assumption?
23       A. Well, I mean, I think it was already something
24 that the nurse was aware of.
25       Q. How do you know that?

1      A.   Well, I don't honestly, but...

2      Q.   So do you know whether or not you personally

3 communicated to Nurse Plank that you suspected drug

4 detox or withdrawal?

5      A.   No, not during that phone call.  No.

6      Q.   Do you recall whether or not you communicated

7 the vitals?

8      A.   Yes, of course.  That would be the whole

9 reason for the phone call.

10     Q.   Okay.  And you would have given the actual

11 values, the numerical values?

12     A.   Yes.

13     Q.   Okay.  You don't recall what those were?

14     A.   No, sir.

15     Q.   And you didn't log them?

16     A.   No, sir.

17     Q.   Do you recall telling the nurse that

18 Ms. Hulsey was panicking?

19     A.   I believe so.

20     Q.   Okay.  And what do you mean by "panicking"?

21     A.   She was just -- it just seemed like she didn't

22 want to be in the back anymore, so it kind of seemed

23 like a way for her to get out of there, was to ask for

24 some medical attention.

25     Q.   All right.  Did you ever tell the nurse that

1    Q.   Okay.  Would you have told Nurse Plank that
2  she was hurting everywhere?
3    A.   Maybe.  I probably would have just said that
4  she was complaining of pain.
5    Q.   So you were directed by the nurse to
6  administer Tylenol?
7    A.   Or ibuprofen.  I don't recall.
8    Q.   And I take it at this point, that's an
9  over-the-counter strength?
10   A.   Yes, sir.
11   Q.   Okay.  Did you personally take her from the
12 dorm to medical observation?
13   A.   I don't know if I actually put her in cell,
14 but I took her from the dorm to booking where we did the
15 vitals.
16   Q.   Okay.  What, if any, other interaction did you
17 have with Ms. Hulsey after that?
18   A.   I don't remember having any further
19 interaction.
20   Q.   Were you ever informed or told about
21 Ms. Hulsey's condition after that day?
22   A.   I understood that she went to the hospital.
23   Q.   Okay.  And that was the next day, on the 12th?
24   A.   I'm not sure if it was the next day.  I don't
25 know what days of the week it was.  I might have been

**REPORTER'S CERTIFICATION**

STATE OF TENNESSEE  )
COUNTY OF DAVIDSON  )

   I, Penny Townsend Morrison, LCR #423, RMR #823002, CCR #226, licensed court reporter, in and for the State of Tennessee, do hereby certify that the above deposition transcript of MARK MITCHELL BRYANT was reported by me on January 14, 2019, and that the foregoing pages of the transcript are a true and accurate record to the best of my knowledge, skills, and ability.

   I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

   I further certify that I am duly licensed by the Tennessee Board of Court Reporting as a Licensed Court Reporter as evidenced by the LCR number and expiration date following my name below.

/Penny Townsend Morrison/
Penny Townsend Morrison
LCR #423, RMR #823002, CCR #226
LCR Expiration Date 6/30/20
Accurate Court Reporting
P.O. Box 682683
Franklin, Tennessee  37068
Signature Date: January 28, 2019