```
          IN THE UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF TENNESSEE
                  NASHVILLE DIVISION
```

MARGARET CRAIG, as next of )
kin and personal )
representative of the estate )
of Angela Hulsey, )
  )
      Plaintiff, )
  )
  )
  ) No. 3:17-cv-01335
vs. ) JURY DEMAND
  ) JUDGE CAMPBELL
  ) MAGISTRATE HOLMES
  )
CHEATHAM COUNTY, TENNESSEE, )
BEN MOORE, MARK BRYANT, )
STEPHANIE GIZZI-BELL, JESSICA )
PLANK, et al., )
  )
      Defendants. )

_____

**The Deposition of**

**HARLEY DESTINY ALEXXIS DURHAM**

**January 14, 2019**

_____

Penny Townsend Morrison, RMR, LCR, CCR
Accurate Court Reporting
The Pilcher Building
P.O. Box 682683
Franklin, TN  37068
(615) 244-DEPO or 244-3376
www.ACR-Nashville.com

1  Q. All right.
2  A. I lived and worked in Texas until about
3 October of 2013. That is when I moved to Charlotte,
4 Tennessee, and I began working at the Ashland City
5 Walmart until June of 2015.
6  Q. What brought you to Tennessee?
7  A. I love Tennessee, and I tell everybody it's
8 really my husband that really drew me to Tennessee.
9  Q. Okay. I thought you were going to say you had
10 to get out of Texas.
11  A. No.
12  Q. So you worked at Ashland City Walmart until
13 when?
14  A. Until June of 2015.
15  Q. Okay. And what did you do at that point?
16  A. I -- what I did at Walmart?
17  Q. After Walmart.
18  A. Oh, I got hired on at the jail.
19  Q. That's what I thought, but I wanted to make
20 sure. So from -- is it June or July that you started
21 at Cheatham --
22  A. June.
23  Q. Okay. So June of 2015, you started at
24 Cheatham County Jail?
25  A. Yes, sir.

```
 1        Q.   All right.  And I take it you hired in as a
 2   corrections officer?
 3        A.   Yes, sir.
 4        Q.   Okay.  How long did you work for the jail?
 5        A.   For about two years and a little over four
 6   months.
 7        Q.   All right.  I don't need the day, but what was
 8   the date of separation, month and year?
 9        A.   October 2018.
10        Q.   Okay.  That's a little over three years.  Did
11   you say two years?  If you started in June of '15 and
12   left October of '18 --
13        A.   Sorry.  Now, I'm trying to think.  I left a
14   year ago.  Sorry.  It was 2017.
15        Q.   Okay.
16        A.   Yes.  Sorry.
17        Q.   All right.  That's fine.  And what was the
18   reason you left?
19        A.   To pursue education.  It was conflicting
20   schedules.
21        Q.   All right.  And what kind of education?
22        A.   I wanted to go in for music education.
23        Q.   So did you pursue any kind of schooling for
24   that?
25        A.   I did not.  The financial aid fell through.
```

1  Q. That's fine. Did you ever have personal
2  experience with an inmate or detainee that actually died
3  at the jail?
4  A. No, sir.
5  Q. Did you ever have personal experience with an
6  inmate or detainee that you had to call the nurse for
7  medical assistance?
8  A. Not that I can remember. It's usually our
9  supervisors that would contact the nurse.
10 Q. All right. And is that what happened in this
11 case with the seizure you were talking to us about?
12 A. Yes, sir.
13 Q. So your supervisor for that shift is the one
14 that actually called the nurse?
15 A. Yes, sir.
16 Q. Okay. So you personally never had to call the
17 nurse?
18 A. Correct.
19 Q. Is the same true for calling a doctor?
20 A. Correct. With the nurse, if you had to
21 contact the nurse, the nurse would contact the doctor.
22 I don't ever recall any of us having to speak with the
23 doctor ourselves.
24 Q. So you don't even recall a supervisor speaking
25 with the doctor?

```
1              MS. CRANE:  Objection to form.
2              You can answer if you understand.
3         A.   I understand.  I'm just trying to recall.
4              I'm sorry.  I can't recall a time.
5         Q.   (By Mr. Moseley)  Okay.  That's fine.  And so
6    somebody would come into booking and you would watch
7    them if they showed signs of intoxication or that they
8    were on drugs, and then you would also watch to make
9    sure that they weren't having any detox withdrawal
10   problems.  Is that fair to say?
11        A.   Yes, sir.
12        Q.   All right.  And if they did have these
13   withdrawal symptoms, you would take vitals.  Is that
14   correct?
15        A.   Yes, sir.
16        Q.   Okay.  How often would you take somebody's
17   vitals?
18        A.   Quite frequently.  Anytime an inmate felt ill,
19   they always would ask for their vitals to be checked.
20        Q.   Was there any set schedule like if somebody is
21   in medical observation, you take their vitals once an
22   hour?  Once a shift?
23        A.   No.  If we feel the need to, yes.  And also if
24   they request it, yes.
25        Q.   And what vitals would you take?
```

```
 1      A.   The blood pressure, the oxygen, and the
 2   temperature.
 3      Q.   And these are all devices that you have at the
 4   jail?  You have a blood pressure cuff that's electronic.
 5   You don't have to read the mercuries, pressures, and all
 6   that?
 7      A.   Correct.
 8      Q.   The oxygen, is that just that little thing
 9   that clips on their finger?
10      A.   Yes, sir.
11      Q.   And the temperature, was that a forehead wand?
12      A.   Yes, sir.
13      Q.   And then you mentioned the symptoms.  You
14   would also take note of what you observed with the
15   person?
16      A.   Yes, sir.
17      Q.   Okay.  And then that would be passed on to a
18   supervisor?
19      A.   Yes, sir.
20      Q.   Okay.  How would you pass that on to the
21   supervisor?  In other words, was it written down and
22   communicated in a report, or was it verbally given?
23      A.   A good portion of the time I didn't have a
24   piece of paper with me, so I would write it on my hands.
25   But I would write down like the temperature, their blood
```

```
 1  appearing to be ill, and that was information that you
 2  observed, whether or not it was something that was given
 3  by them.  Is that what you told me earlier?
 4       A.   Yes, sir.
 5       Q.   Did you ever have any experience with inmates
 6  or detainees that were too sick to be able to convey to
 7  you their medical history?
 8       A.   Not that I remember.
 9       Q.   Let me ask you about Ms. Hulsey now.  We will
10  get specific with her.
11            Did you know Ms. Hulsey before this incident?
12       A.   When I had first started at the jail, she was
13  housed in population.
14       Q.   So back in 2015?
15       A.   Yes, sir.
16       Q.   Okay.  And what did you know about her at that
17  time other than her just being an inmate, if that's all
18  you knew?
19       A.   That she had a bad drug addiction, and that
20  she was -- whenever she got released, she was looking
21  forward to staying sober.  That's pretty much it.
22       Q.   She was looking forward to staying sober?
23       A.   Yes, sir.
24       Q.   Is that something that she communicated to
25  you?
```

1  A. Yes, sir.
2  Q. How did you know she had a bad drug addiction?
3  A. She had stated so.
4  Q. All right. Do you remember what she was in
5  jail for back in 2015?
6  A. I do not know. I made it a point really not
7  to know their charges.
8  Q. Did you have any interaction with Ms. Hulsey
9  after 2015 but before October of 2016? That's when this
10 incident took place.
11 A. None that I can remember. Only if she came
12 into jail.
13 Q. All right. So you don't have a specific
14 memory of any other times that she may have -- you may
15 have had an encounter with her prior to October 2016?
16 A. Correct.
17 Q. Okay. What's your first recollection of
18 interacting with Ms. Hulsey in October of 2016?
19 A. I was sitting out back of booking when she was
20 brought in, and I had noticed that she had lost a lot of
21 weight.
22 Q. When you say "sitting out back," is that --
23 A. There's tables out back for like break time,
24 and that's where we would sit before shift.
25 Q. So you actually observed Ms. Hulsey being

```
 1   brought in after she was arrested?
 2       A.   Yes, sir.
 3       Q.   Okay.  And your observation was that it looked
 4   like she had lost a lot of weight?
 5       A.   Yes, sir.
 6       Q.   Anything else?
 7       A.   That was it.
 8       Q.   Did you have any direct interaction with her
 9   at that time?
10       A.   Not that I can remember.
11       Q.   And I think you told us earlier you personally
12   did not conduct her intake?
13       A.   Correct.
14       Q.   Were you on break at the time?
15       A.   My shift hadn't started yet.
16       Q.   So you were waiting to start your shift?
17       A.   Yes, sir.
18       Q.   Okay.  What is your next recollection of any
19   interaction you had with Ms. Hulsey after that?
20       A.   Just her asking for her vitals to be checked
21   the night that she was brought up to booking on medical
22   watch on my shift.  She had told me that she wasn't
23   feeling well, but then had stated that she didn't do
24   good with staying sober.
25            When she asked me to take her vitals, I said I
```

1  would.  When I came back to take her vitals, I was also
2  passing out medication and doing a head count and
3  security check.
4      Q.   And I think I heard you say something about
5  "booking," and so let me make sure.  Do you recall
6  relative to -- October 6th, I think, was date that she
7  got booked.  Do you recall relative to October 6th when
8  this encounter took place?
9      A.   That was the night, I think, of the 11th.
10     Q.   All right.  You don't recall any other
11 interaction with Ms. Hulsey from October 6th through the
12 10th?
13     A.   I do not.
14     Q.   Okay.  So on the 11th is when she asked you
15 for her vitals to be taken?
16     A.   Yes, sir.
17     Q.   And she told you she was not feeling well?
18     A.   Correct.
19     Q.   Did she ever use the phrase "I feel like I'm
20 dying"?
21     A.   No, sir.
22     Q.   And at the time that this was going on, you
23 were doing head count and med pass?
24     A.   And security check.
25     Q.   And security check.  And so did you do -- take

1  her vitals?
2      A.   At this time, she was -- I had her sit across
3  from me at the table, and she did so.  And when I began
4  to do -- to take her vitals, she had what appeared to me
5  as a seizure.  I had reached over and grabbed her by the
6  front of her oranges to prevent her from falling and
7  hurting herself.  I wasn't really in the position to be
8  able to go around the table in time to be able to like
9  take her to the floor, so...
10     Q.   Ease her to the floor, I assume?
11     A.   Sorry.  Sorry.  But I do recall that an inmate
12 did come over and assist me with it.
13     Q.   Do you remember who that was, that other
14 inmate?
15     A.   I do not recall.
16     Q.   Do you remember if Tia Newman was involved in
17 that incident?
18     A.   I don't remember if it was Tia Newman.
19     Q.   Do you know Tia Newman?
20     A.   I do.
21     Q.   What about Deanna Brisco?
22     A.   I don't recall if she was the one to assist
23 me.
24     Q.   Okay.  But there was some inmate that
25 assisted?

```
1        A.   Yes.
2        Q.   And the reason I was talking about "taking her
3   to the floor," in a correctional setting, I was
4   thinking --
5        A.   Right.
6        Q.   -- you know, going hands-on and maybe having
7   to restrain somebody.
8        A.   No, no.
9        Q.   This was not a use of --
10       A.   No.  This was ease her to the floor so she
11  wouldn't hurt herself.
12       Q.   But not a use-of-force situation?
13       A.   No, sir.
14       Q.   Okay.  Did you have to grab an ammonia
15  capsule?
16       A.   I did not have the opportunity to as I was in
17  Big Dorm with her and the ammonia capsules are in
18  booking.
19       Q.   That was my next question.  I wanted to make
20  sure where this was, but this was in Big Dorm?
21       A.   Yes, sir.
22       Q.   Okay.  So you grabbed her.  Another inmate
23  assists.  Do you get her to the floor?  What happens
24  then?
25       A.   We were able to ease her to the floor so she
```

1  can finish her seizure.  We had then moved her to her
2  bunk, which was just mat in a plastic "boat," as we
3  called them.  And by this point, I had radioed for Mark
4  Bryant to come back to the dorm.
5       Q.   And was he your supervisor?
6       A.   Yes, sir.
7       Q.   Did you have any other supervisor on that
8  shift?
9       A.   Mark, our corporal.  Roger Temple was the
10 sergeant.  And I think at that time, Josh Marriott was
11 the FTO.
12      Q.   All right.  So did she get moved back to the
13 bunk prior to Mark Bryant arriving?
14      A.   Yes.  We were able to move her there safely.
15      Q.   Did you complete her vitals?
16      A.   I was not able to complete her vitals.
17      Q.   Did you get any of her vitals?
18      A.   I did not.  They would not read -- the blood
19 pressure wouldn't read on them.
20      Q.   What about the pulse ox; did you try that?
21      A.   I don't remember.
22      Q.   And do you recall if you took her temperature?
23      A.   No, sir.
24      Q.   You don't recall or you --
25      A.   I don't recall.

```
 1      Q.   So tell me what happened once Mark Bryant got
 2  back there.
 3      A.   When he came back, I was still next to
 4  Ms. Hulsey, and I had explained to him that she had what
 5  appeared to me was a seizure, what had happened.  We had
 6  moved her back to her bunk.  And by this point, he was
 7  trying to speak with her, but her tongue was out, and so
 8  she was trying to talk around it.  He had asked her why
 9  her tongue was out, just so he would have, I would
10  assume, a better understanding of what had happened.
11      Q.   All right.  And so she had difficulty speaking
12  because her tongue was out --
13      A.   Yes, sir.
14      Q.   -- following the seizure?
15      A.   Yes, sir.
16      Q.   She didn't have her tongue out before the
17  seizure, I take it?
18      A.   Correct.
19      Q.   Okay.  Did she have any difficulty explaining
20  to you that she wasn't feeling good before the seizure?
21      A.   No, sir.  She was able to speak clearly.
22      Q.   Could you make any other observations about
23  her condition other than her verbally telling you that
24  she didn't feel well?
25      A.   Her just being shaky.
```

```
 1                REPORTER'S CERTIFICATION

 2   STATE OF TENNESSEE  )
     COUNTY OF DAVIDSON  )
 3

 4           I, Penny Townsend Morrison, LCR #423,

 5   RMR #823002, CCR #226, licensed court reporter, in and

 6   for the State of Tennessee, do hereby certify that the

 7   above deposition transcript of HARLEY DESTINY ALEXXIS

 8   DURHAM was reported by me on January 14, 2018, and that

 9   the foregoing pages of the transcript are a true and

10   accurate record to the best of my knowledge, skills, and

11   ability.

12           I further certify that I am not related to nor

13   an employee of counsel or any of the parties to the

14   action, nor am I in any way financially interested in

15   the outcome of this case.

16           I further certify that I am duly licensed by

17   the Tennessee Board of Court Reporting as a Licensed

18   Court Reporter as evidenced by the LCR number and

19   expiration date following my name below.

20

21                    /Penny Townsend Morrison/
                      Penny Townsend Morrison
22                    LCR #423, RMR #823002, CCR #226
                      LCR Expiration Date 6/30/20
23                    Accurate Court Reporting
                      P.O. Box 682683
24                    Franklin, Tennessee  37068
                      Signature Date: January 28, 2019
25
```