IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MARGARET CRAIG, as next of      )
kin and personal                )
representative of the estate    )
of Angela Hulsey,               )
                                )
          Plaintiff             )
                                )
vs.                             )    Case No. 3:17-cv-01335
                                )    JURY DEMAND
                                )    JUDGE CAMPBELL
CHEATHAM COUNTY, TENNESSEE,      )    MAGISTRATE HOLMES
BEN MOORE, MARK BRYANT,          )
STEPHANIE GIZZI-BELL, JESSICA   )
PLANK, et al.,                  )
                                )
          Defendants

_____

**The deposition of**

**JEFF KEY**

**December 12, 2018**

_____

CHERYL H. CARTER, RPR, LCR, CCR
Accurate Court Reporting
P.O. Box 682683
Franklin, TN 37068
(615) 244-DEPO or 244-3376
www.ACR-Nashville.com

14

1 believe, 2016.  So I think it was the first part,

2 February, March, something like that of 2016 when I

3 moved back.

4      Q.    All right.  I should have had you bring your

5 resume.

6      A.    I know.  Right?

7      Q.    I didn't know we were going to need to get to

8 yogurt shops, but that's okay.

9            So Cheatham County Sheriff's Office 2016.  You

10 still work there?

11      A.    Yes, sir.

12      Q.    And have you worked any other jobs other than

13 maybe owning a yogurt shop?

14      A.    Yes.  I worked a lot of off-duty jobs that,

15 you know --

16      Q.    Security-type jobs?

17      A.    Yeah, traffic and stuff like that.

18      Q.    And what did you hire in as?

19      A.    I worked in the jail for the first year.

20      Q.    As a corrections officer?

21      A.    Yes.  And then moved to school resource

22 officer after the first year and then transferred to

23 patrol division about nine months ago maybe, something

24 like that.

25      Q.    All right.  But as of October 2016, which is

15

1  the time period involved in this case, you were a

2  correction officer at the jail?

3       A.    Yes.

4       Q.    Okay.  As part of your training prior to being

5  hired by Cheatham County, had -- you had received, I

6  assume, but correct me if I'm wrong, basic CPR/first aid

7  training?

8       A.    Yeah.  It had expired, but, yes, I had had it

9  in the past.

10      Q.    Had you had any training regarding

11 identification of individuals that were intoxicated?

12      A.    No.  Just -- other than, like, being a BAT

13 tech, which means a blood alcohol technician, being able

14 to do field sobriety and things like that to determine,

15 no.

16      Q.    Okay.  What about any training in how to

17 identify and then deal with detainees or inmates that

18 are detoxing or withdrawing from some type of substance?

19      A.    Nothing.  No training, no.

20      Q.    And same question regarding somebody, detainee

21 or inmate, suffering from some kind of illness.

22      A.    No.

23      Q.    Did you know Ms. Hulsey prior to October 2016?

24      A.    No.

25      Q.    Did you know any of her family?

```
                                                           16
 1        A.    I did know Jeremy Shivers, but I didn't know
 2   he was family until after this incident.
 3        Q.    And --
 4        A.    Just from the jail.
 5        Q.    All right.  Your understanding of their
 6   relationship came from what?
 7        A.    Just knew that they were dating from -- I
 8   think he said -- he calls her his wife or called her his
 9   wife, I think.  We just didn't know if it was girlfriend
10   or wife.
11        Q.    Okay.  But that was from Mr. Shivers directly?
12        A.    Yes.
13        Q.    Okay.  What recollection do you have of any
14   interaction you had with Ms. Hulsey?
15        A.    The only recollection I have is when she was
16   pulled up to booking the night that she wasn't feeling
17   well.  I don't recall the date, and it was prior to
18   our -- we were just fixing to leave shift in about 20 or
19   30 minutes, and we pulled her up because she was having
20   some kind of fatigue or illness, some sort, wasn't
21   feeling well.  Mark Bryant was the supervisor on duty.
22        Q.    I was going to say what shift do you recall
23   that was?
24        A.    Second shift.
25        Q.    Second shift?
```

17

1       A.    Yes, sir.

2       Q.    Have you reviewed the booking logs?

3       A.    I've read the booking logs, not the tower

4  logs, and some of the medical logs.

5       Q.    Did any of that help refresh your memory as to

6  which day it was?

7       A.    Just -- I want to say it was the 11th, but

8  I'm not positive.

9       Q.    Okay.  And you think your recollection took

10  place at the end of that shift?

11       A.    Yes, sir, probably approximately 9:30 or a

12  little after maybe.

13       Q.    And what all do you recall?

14       A.    I recall --

15            MR. USERY:  Can I make a clarification real

16  quick?

17            MR. MOSELEY:  Yeah.

18            MR. USERY:  Our distinction between military

19  time --

20            THE WITNESS:  Gotcha.

21            MR. USERY:  -- and that time, so I know we've

22  gone through some of these.  And so second shift, 9:30

23  would be?

24            THE WITNESS:  Yeah, 2130.

25            MR. MOSELEY:  That's fine.

18

1      A.    All right.  I recall her being in booking.  I

2 don't recall if I was -- who brought her back from the

3 dorm that she was in.  And I remember her sitting in the

4 chair not feeling well, checking -- I don't know if it

5 was Mark or myself that checked her stats or both while

6 she was in there, her temperature, her blood pressure,

7 and her O2 sats.  And then I know that Mark said that he

8 was going to call the nurse and let her know the stats.

9      Q.    (By Mr. Moseley)  All right.  Do you know how

10 the vital signs or stats were recorded?

11      A.    Usually they're recorded in the booking log

12 and in -- when I took the stats from someone, I would

13 call -- if I was in booking, I would also call the tower

14 and let them log it in that book as well.

15      Q.    Is that different, the upper control?

16      A.    No, that's the same thing, upper control.

17 Sorry.

18      Q.    In reviewing the booking log, did you see any

19 record of her vitals being taken by either yourself or

20 Mr. Bryant?

21      A.    No, sir.

22      Q.    Do you know why that wasn't included in the

23 log at that time?

24      A.    I don't.  Once I -- when you have a supervisor

25 that works in booking, usually they kind of take charge

19

1 of that.  They're the ones that called the nurse, give

2 the stats, and do all that.  I don't believe I logged

3 anything in the log that night, myself personally,

4 because I wasn't the one sitting in the booking room.  I

5 was the one that would be outside the booking room maybe

6 doing security checks and the booking log or maybe

7 booking someone in, so I have no idea why it wasn't.

8      Q.    Was it Mr. Bryant who was the supervisor --

9      A.    Yes, sir.

10     Q.    -- for your shift?

11     A.    Yes, sir.

12     Q.    But you definitely recall taking blood

13 pressure --

14     A.    Yes, sir.

15     Q.    -- pulse rate, oxygen rate, and temperature?

16     A.    Yes, sir.

17     Q.    Okay.  You personally didn't call the nurse

18 that night?

19     A.    No, sir.

20     Q.    Okay.  Did you personally witness the nurse

21 being called by -- by Mr. Bryant?

22     A.    I witnessed him on the phone, and he had a

23 conversation with someone.  I didn't hear the

24 conversation.  Once he got off the phone, he told me

25 that we needed to put her on med watch and to -- I

20

1  believe it was Ibuprofen or Tylenol or something like

2  that that we had to give her.

3       Q.    Okay.

4       A.    But I don't recall if there was anything else

5  that we had given her that the nurse told us to give

6  her.

7       Q.    Okay.

8       A.    But she had said put her on medical watch, and

9  that was really the extent of what I had knowledge of at

10 that point.

11      Q.    Before I forget -- and we're going to make

12 this an exhibit to your deposition -- I'll have you go

13 through the log just like we did for every one else.

14 You are Number 7.

15      A.    Seven, yes, sir.

16      Q.    So just put 7 by your entries, if any.

17      A.    (Complies.)  There's one missing.

18      Q.    Which one is missing?

19      A.    If we do this one, we have to do this one as

20 well.

21      Q.    Okay.  For the record when you say "this

22 one" --

23      A.    Okay.  So when there's --

24      Q.    What you're pointing to is the Observation

25 Cell Record?

23

1 which by this means I checked her and she was crying.

2     Q.   All right.  Do you have a recollection of her

3 crying?

4     A.   I don't, sir.

5     Q.   Any reason to doubt that she was crying if

6 that's what you marked?

7     A.   No, not at all.

8     Q.   And then this is a page, I think, you said

9 would be a companion to that other one?

10     A.   Yes, sir.

11     Q.   I don't know that you had to mark that one.

12 All of the entries on that log are yours.  Correct.

13     A.   Yes, sir.

14     Q.   And that log seems to contain different

15 information than what was on the companion log that you

16 had marked.

17         What is this log showing?

18     A.   This log shows that she was brought to booking

19 for medical observation at 2140.

20         At 2145 hours Corporal Bryant gave her

21 medication per the nurse.

22         And then at 2150 she was placed in the cell

23 number 3.

24     Q.   So up until being placed in the cell, would

25 she have just been at the counter?

26

1          MR. USERY:   Object to the form.

2          MS. WILLIAMS:   Object to the form.

3      A.   I don't recall that.  I don't know.

4      Q.   (By Mr. Moseley)  Did you notice any other log

5  entries that you made regarding Ms. Hulsey other than

6  these?

7      A.   No, sir.

8      Q.   And do you have any recollection of any other

9  interaction with Ms. Hulsey other than these incidents?

10      A.   This was my only interaction with her.

11      Q.   Did you ever become aware prior to this

12  litigation that Ms. Hulsey had to be transported from

13  the jail to the hospital?

14      A.   Yes, sir.

15      Q.   Okay.  When and how did you become aware of

16  that?

17      A.   I believe it was the next day when we came on

18  the shift.  It was during the pass-on shift -- pass-on

19  log.

20      Q.   So that was information --

21      A.   Yes, sir.

22      Q.   -- that was made to you in a briefing?

23      A.   From the first shift guys, yes, sir.

24      Q.   To let -- let you know that she was no longer

25  in the jail?

30

1                    **REPORTER'S CERTIFICATION**

2   STATE OF TENNESSEE  )
    COUNTY OF DAVIDSON  )

3

4              I, Cheryl H. Carter, LCR #315, RPR #820707,

5   CCR #137, licensed court reporter, in and for the State

6   of Tennessee, do hereby certify that the above

7   deposition transcript of JEFF KEY was reported by me on

8   December 12, 2018, and that the foregoing pages of the

9   transcript are a true and accurate record to the best of

10  my knowledge, skills, and ability.

11             I further certify that I am not related to nor

12  an employee of counsel or any of the parties to the

13  action, nor am I in any way financially interested in

14  the outcome of this case.

15             I further certify that I am duly licensed by

16  the Tennessee Board of Court Reporting as a Licensed

17  Court Reporter as evidenced by the LCR number and

18  expiration date following my name below.

19

20

21                    /Cheryl H. Carter/
                       Cheryl H. Carter
22                     LCR #315, RPR #820707, CCR #137
                       LCR Expiration Date 6/30/18
23                     Accurate Court Reporting
                       P.O. Box 682683
24                     Franklin, Tennessee  37068
                       Signature Date: December 27, 2018

25

ACCURATE COURT REPORTING (615) 244-DEPO OR 244-3376