IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


MARGARET CRAIG, as next of      )
kin and personal representative )
of the estate of Angela Hulsey, )
                                )
            Plaintiff,           )
                                )
vs.                             )  No. 3:17-cv-01335
                                )  JURY DEMAND
                                )  JUDGE CAMPBELL
CHEATHAM COUNTY, TENNESSEE,      )  MAGISTRATE HOLMES
et al.,                         )
                                )
            Defendants.          )

_____

**The deposition of**

**BENJAMIN MOORE**

**November 6, 2018**

_____



TAMI R. WEBB, RPR, LCR, CCR
ACCURATE COURT REPORTING
P.O. Box 682683
Franklin, TN  37068
(615) 244-DEPO or 244-3376
www.ACR-Nashville.com

8

1      Q.   Okay.  Have you ever been charged with a crime
2  before?

3      A.   As a juvenile once.

4      Q.   Okay.  And how did you come to work for the
5  Cheatham County Jail?

6      A.   I left the Tennessee Department of Corrections in
7  early March of 2011.  I interviewed with the sheriff's office
8  in March of 2011, and was hired as a correctional officer.

9      Q.   All right.  Tell me a little bit about your
10  educational background with high school moving forward.

11      A.   I graduated from Cheatham County High School 2006;
12  I proceeded on and went to Remington College and received an
13  associate's degree in criminal justice.

14      Q.   Was that in 2010?

15      A.   2009.

16      Q.   Okay.  So 2009.

17           And then did you go to work for TDOC right after?

18      A.   No, I worked security for a little bit.

19      Q.   With like a private security firm?

20      A.   Yeah.

21      Q.   Okay.  Who was that?

22      A.   Valor Security, I believe.

23      Q.   Who's that again?

24      A.   Valor Security.

25      Q.   Valor?

9

1    A.    Yeah.

2    Q.    Okay.  Did it provide security to commercial

3  facilities or what?

4    A.    At Opry Mills Mall.

5    Q.    Okay.  And when did you start at TDOC?

6    A.    I believe it was October of 2010, if I'm not

7  mistaken.

8    Q.    All right.  I'm going to assume that you received

9  some training through TDOC.  So is that fair to say?

10    A.    A little bit, yes, sir.

11    Q.    Okay.  Tell me about the training you got with

12  TDOC.

13    A.    Just how to interact and handle inmates.  You know,

14  the daily tasks that you are assigned to do, as far as

15  counting them, feeding them, searching them, et cetera.

16    Q.    All right.  And how long was -- is there like a

17  probationary period?  How long did you either have like an

18  FTO or somebody that you had to learn from?

19    A.    Yeah, after -- TDOC has their own basic training

20  academy; it's six weeks long.  After that, you're assigned a

21  facility.  You go to that facility, depending on how quick

22  you catch on.  I think I was on FTO for maybe two weeks at

23  the most.  And then you're pretty much on your own.

24    Q.    All right.  What facility did you serve at?

25    A.    Riverbend.

18

1  was I would advise her of the situation to let her know, Hey,
2  this person's got this going on and they're filling a sick
3  call out.
4       Q.   All right.  How is -- other than if the nurse is
5  right there at the time of one of these incidents, how would
6  the nurse be contacted?
7       A.   Via telephone.
8       Q.   All right.  If the nurse is present in the
9  facility, is there still a cell phone or some means of
10  contact?  Radio?
11      A.   Well, from where the booking office is and the
12 nurse's office, you can see through a window so you just have
13 to walk around and you can go right in there.
14      Q.   And the nurse never has to make rounds throughout
15 the rest of the jail?
16      A.   She does on med pass and stuff in the mornings.
17      Q.   Okay.  So if she's on med pass, how would you
18 contact the nurse?
19      A.   Through another officer that was with her.
20      Q.   Okay.  So do a radio --
21      A.   Yeah.
22      Q.   Okay.  And if the nurse isn't there, there's a
23 24-hour call-in line that you can always contact somebody?
24      A.   Correct.
25      Q.   Okay.  Did you know Ms. Hulsey outside of working

1  at the jail?

2       A.   No.

3       Q.   Okay.  When was the first time that you knew about

4  Ms. Hulsey from working in the jail?

5       A.   I can't tell you exactly when.  I know that I had

6  encounters with her previously on other charges that she was

7  booked in for.

8       Q.   All right.  What did you know about her at that

9  time?

10      A.   You know, you hear the inmates talk.  You know, I

11 heard her talk, you know, numerous times that -- you know,

12 that she did drugs, she associated with people that did

13 drugs.

14      Q.   So you heard her talk about doing drugs?

15      A.   Yeah.

16      Q.   Okay.  Other than drugs, anything else that you

17 knew about Ms. Hulsey prior to this incident?

18      A.   No.

19      Q.   All right.  When was the first encounter you had

20 with Ms. Hulsey in October of 2016?

21      A.   I believe on the 10th.

22      Q.   All right.  Describe what that encounter was.

23      A.   If I can recall, she was in booking, and I believe

24 it was just on the med watch forms.

25      Q.   All right.  And let me ask this question:  Is your

22

1   the nurse?

2        A.    Not that day, no.

3        Q.    Okay.

4        A.    I do on the 12th, though.

5        Q.    Okay.  And that's what I'm asking:  What's the next

6   recollection that you have?

7        A.    Well, on the 12th, another officer had walked by

8   the cell and I believe Ms. Hulsey alerted to him that she

9   didn't feel well.  And he came and told me.  And I told him

10  to -- the nurse was currently outside.  I told him to go

11  notify her that she wasn't feeling well.

12        Before she entered, I believe I escorted Ms. Hulsey

13  out of the cell and assisted her to sit down in a chair at

14  the booking counter to wait on the nurse.

15        Q.    All right.

16        A.    She did appear a little shaky and weak.  Other than

17  that, I didn't see any other, you know, signs of illness.

18        Q.    All right.  Did you have any conversation with her

19  at that time?

20        A.    Yeah.  She stated to me that she was having trouble

21  breathing, but I couldn't pick up on that.  She was talking

22  to me fine.  And I just advised her that the nurse was going

23  to be in there shortly.

24        Q.    All right.  Did you observe the interaction that

25  she had with the nurse that day?

1  recall writing it on the logbook or the medical observation
2  sheet.  I believe I just -- a lot of times I would jot stuff
3  down and just keep it to the side in case I needed it when
4  our shift was over.
5      Q.   You just used the term "personal note."  Is that
6  what you're talking about?
7      A.   Yes.
8      Q.   Do you keep any of your personal notes?
9      A.   (Witness shakes head.)
10     Q.   What do you do -- is that a no?
11     A.   After the day, pretty much throw them away.
12     Q.   Okay.  So you will have personal notes that you may
13 take information down that will help you then prepare other
14 notes or reports?
15     A.   Correct.
16     Q.   At the end of the day, you don't preserve those
17 personal notes, those are discarded?
18     A.   Right.
19     Q.   Okay.  So after you received the vital signs, what
20 do you recall happening after that?
21     A.   I believe she was -- I think she had another bowel
22 movement - I'm not sure - and was given a shower.  I had a
23 female -- another female officer come up there and assist
24 Ms. Hulsey with that.
25     Q.   All right.

25

1      A.    And if I'm not mistaken, I think the nurse had

2   maybe gave her some Tylenol and placed her back in the cell

3   and continued med watch.

4      Q.    All right.  What's your next recollection after she

5   had the shower, maybe got some Tylenol, and was put back in

6   the cell?

7      A.    I heard a loud banging noise from the cell.  It was

8   another inmate alerting that Ms. Hulsey was not responsive

9   and was drooling.  I entered the cell, observed Ms. Hulsey

10  not responding and drooling.  I immediately, you know, got

11  the nurse.  The nurse had came in, tried to get her to

12  respond, there was no response.  She asked for an ammonia

13  capsule, I believe, and we tried to put ammonia in her nose

14  and she didn't respond to that.  And then, if I can remember

15  correctly, the nurse asked me to get the pulse ox meter out

16  of her office, which I did.  And she put it on Ms. Hulsey.

17  And then advised me to call 911.  And I believe the nurse

18  was -- after that had started performing CPR while I was

19  talking to emergency services.

20     Q.    All right.  Did you personally call 911?

21     A.    Yes, I did.

22     Q.    All right.  You personally did not participate in

23  the CPR?

24     A.    No.

25     Q.    Okay.  Do you recall what you told the 911

1  operator?

2      A.   If I can remember correctly, I told him that we had

3  a nonresponsive inmate in the cell, gave them her approximate

4  age, weight, and I believe that was it.

5      Q.   Did you tell them that she was coming off drugs?

6      A.   No.

7      Q.   Do you know of anybody else at the jail that would

8  have told them that she was coming off drugs?

9      A.   If the nurse had contact with EMS afterwards and

10 had conversations that I didn't hear, maybe, but I'm not

11 sure.

12     Q.   All right.  Do you know of any information that

13 would support the statement that Ms. Hulsey was coming off

14 drugs at the time?

15     A.   If I remember correctly, I read that Ms. Hulsey

16 advised the nurse that she had used heroin, she was on

17 heroin.

18     Q.   All right.  And that's Nurse Plank?

19     A.   Yes, sir.

20     Q.   And you read that out of Nurse Plank's notes?

21     A.   Right.

22     Q.   Okay.  So is it fair to say you wouldn't have known

23 that until after Nurse Plank prepared those notes?

24     A.   Correct.

25     Q.   And that would have been after this incident was

29

1     Q.   (By Mr. Moseley)  Do you know of any medical care
2  that Ms. Hulsey received at the jail other than the incident
3  where the EMS came in prior to that day?
4     A.   I just assumed the nurse was taking care of her at
5  the time that she seen her.  Other than that, I don't know.
6     Q.   Do you know whether or not if Ms. Hulsey had been
7  provided medical care prior to her becoming nonresponsive
8  that she would have not died?
9         MR. USERY:  Object to form.
10        MR. BEEMER:  Object to the form.
11        MS. WILLIAMS:  Same.
12     A.   Like I say, I'm not -- I'm not sure what -- what
13  kind of treatment the nurse gave her other than I was told
14  she gave her Tylenol.
15     Q.   (By Mr. Moseley)  All right.  And as far as you
16  know, that's over-the-counter Tylenol, not a prescription?
17     A.   As far as I know.
18     Q.   Do you know why Ms. Hulsey was in medical watch?
19     A.   I can't remember off the top of my head why, why
20  she was placed on it.  She may have told the nurse she didn't
21  feel good or something.  I'm not sure.
22     Q.   Did you have any communication with Ms. Hulsey
23  about -- in which she asked or told you that she needed to
24  have -- to see a doctor or any kind of medical help?
25     A.   No.

1  that another inmate or detainee mentioned that Ms. Hulsey

2  needed medical care?

3      A.   Not to me personally, no.

4      Q.   I apologize if I asked this, but do you know why

5  she was having the bowel movements?

6      A.   No, I'm not sure.

7      Q.   Did you personally observe her condition get worse

8  while she was in the jail?  I know you only were there for --

9  or you have a recollection of just a few days.  But from the

10  time that you first saw her to the time obviously she got

11  taken out by ambulance, do you recall her condition getting

12  worse?

13          MR. USERY:  Object to form.

14      A.   Not that I recall.

15      Q.   (By Mr. Moseley)  So is it your testimony that her

16  condition remained steady during the time that you observed

17  her until she became nonresponsive?

18      A.   Correct.

19          MR. USERY:  Same objection.

20          MS. WILLIAMS:  Objection.  Form.

21      Q.   (By Mr. Moseley)  Did you ever hear Ms. Hulsey

22  mention to anyone that she felt like she was dying?

23      A.   No, I did not.

24      Q.   You read Nurse Plank's notes.  Do you recall seeing

25  that in her note that she mentioned to Nurse Plank that she

1 felt like she was dying?

2      A.   I believe I did.  I didn't verbally hear it.

3      Q.   After she had her bowel movements, what else was

4 done to care for Ms. Hulsey besides a change of clothes and a

5 shower?

6      A.    If I remember correctly, she sat in the nurse's

7 office and talked with the nurse.  I don't know what

8 continued treatment she got inside the nurse's office.  I

9 wasn't advised.

10      Q.   And you don't recall, based on reading the Nurse

11 Plank's notes, what if any treatment was given?

12      A.   No, sir.

13      Q.   Have you ever personally taken an inmate or

14 detainee's vital signs?

15      A.   Yes, I have.

16      Q.   Okay.  Multiple times or...

17      A.   Several times, yes.

18      Q.   Okay.

19      A.   Pretty much only when the nurse is not available.

20      Q.   Okay.  Tell me the circumstances in how that would

21 arise.

22      A.   Have an inmate come to me and say they had chest

23 pains or they wasn't feeling well or they had -- they say

24 they have a fever or whatever, I'd take their blood pressure,

25 temperature, and pulse ox.

33

1    Q.    And then what would you do with that information?

2    A.    I would direct it to the nurse.

3    Q.    You don't have any recollection of ever taking any

4    vital signs for Ms. Hulsey.  Correct?

5    A.    Correct.

6    Q.    Do you receive training about protecting inmates

7    and detainee's civil rights?

8    A.    I don't recall any training over civil rights the

9    whole time I was at the sheriff's office.

10   Q.    All right.  Did you receive any training about

11   ensuring that detainees or inmates receive medical care?

12   A.    Other than directing them to the nursing staff, no.

13   Q.    Were you aware that -- and I'm talking in general,

14   not specific to this case -- were you aware that the failure

15   to provide medical care for a serious medical need would be a

16   violation of an inmate or detainee's civil rights?

17   A.    Yeah.

18   Q.    How were you aware of that?

19   A.    Common sense.  I mean...

20   Q.    Are you aware that if somebody has a serious

21   medical need that isn't treated that there is a risk that the

22   person could suffer serious injury or death?

23   A.    I would assume any medical condition could worsen

24   over time if not treated, yes.

25   Q.    I'll ask -- and I don't mind if your attorney needs

36

1                    REPORTER'S CERTIFICATION

2 STATE OF TENNESSEE   )
  COUNTY OF DAVIDSON   )

3

4        I, TAMI R. WEBB, LCR #330, RPR #54171, CCR #0460,

5 licensed court reporter, in and for the State of Tennessee,

6 do hereby certify that the above deposition of **BENJAMIN MOORE**

7 was reported by me on November 6, 2018, and that the

8 foregoing pages of the transcript are a true and accurate

9 record to the best of my knowledge, skills, and ability.

10        I further certify that I am not related to nor an

11 employee of counsel or any of the parties to the action, nor

12 am I in any way financially interested in the outcome of this

13 case.

14        I further certify that I am duly licensed by the

15 Tennessee Board of Court Reporting as a Licensed Court

16 Reporter as evidenced by the LCR number and the expiration

17 date following my name below.

18

19

20

21

22                    /Tami R. Webb/
                       Tami R. Webb, RPR, LCR, CCR

23                     RPR #54171, LCR #330, CCR #0460
                     LCR Expiration Date 6/30/20

24                     Accurate Court Reporting
                     P.O. Box 682683

25                     Franklin, TN  37068
                     Signature Date:  November 19, 2018