IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MARGARET CRAIG, as next of )
kin and personal )
representative of the estate )
of Angela Hulsey, )
 )
          Plaintiff )
 )
vs. )   Case No. 3:17-cv-01335
 )   JURY DEMAND
 )   JUDGE CAMPBELL
CHEATHAM COUNTY, TENNESSEE, )   MAGISTRATE HOLMES
BEN MOORE, MARK BRYANT, )
STEPHANIE GIZZI-BELL, JESSICA )
PLANK, et al., )
 )

          Defendants

_____

**The deposition of**

**JUSTIN PAUL**

**December 12, 2018**

_____

CHERYL H. CARTER, RPR, LCR, CCR
Accurate Court Reporting
P.O. Box 682683
Franklin, TN 37068
(615) 244-DEPO or 244-3376
www.ACR-Nashville.com

8

1    Q.    All right.  Were you an armed security guard?

2    A.    No, sir.

3    Q.    Okay.  So you did unarmed rounds for offices

4 after hours?

5    A.    Yes, sir.

6    Q.    Okay.  Anything else?

7    A.    And I started at the Cheatham County Sheriff's

8 Office January 9th, 2015.

9    Q.    All right.  And what did you hire in as?

10   A.    Correctional officer.

11   Q.    And did you work anywhere else since being

12 hired at the jail?

13   A.    I had a part-time security job while I was at

14 the jail until probably 2016 to 2018 for Raven Security,

15 and I have started working with my father-in-law

16 installing windows May of this year.

17   Q.    All right.  What is the company that your

18 father-in-law has?

19   A.    He's a private contractor out of Home Depot.

20   Q.    Okay.  Any particular reason you left Raven

21 Security?

22   A.    Didn't have the time.

23   Q.    Are you still a corrections officer, or have

24 you had any kind of promotion or advancement since

25 hiring in in 2015?

1    A.   I am no longer a correctional officer with the
2  sheriff's office, and while I was there, I did have some
3  promotions.
4    Q.   All right.  When did you leave your position
5  with the sheriff's office?
6    A.   May of this year.
7    Q.   About the time you started working for your
8  father-in-law?
9    A.   Yes, sir.
10    Q.   And what was the reason you left the sheriff's
11  office in May of 2018?
12    A.   I was fired.
13    Q.   What reason were you fired?
14    A.   A violation of institutional rules.
15    Q.   Which rule in particular?
16    A.   Use of force.
17    Q.   All right.  Was there a particular incident
18  that you were involved in?
19    A.   Yes, sir.
20    Q.   What was that?
21    A.   I -- or they believed I used excessive force
22  in controlling a inmate who was threatening to urinate
23  and bleed on another officer while intoxicated.
24    Q.   All right.  What type of force was at issue?
25    A.   I handled the back of her neck to gain control

1  of her.

2        Q.    So just hands on?

3        A.    Yes, sir.

4        Q.    Okay.  No chemical weapon, no taser, anything

5  like that?

6        A.    No, sir.

7        Q.    When was that incident?

8        A.    May of this year.

9        Q.    Okay.  So what was the name of the inmate?

10       A.    I cannot remember, sir.

11       Q.    Okay.  You're telling me you had advanced in

12  rank from 2015.  Then we got off on this other thing.

13             So tell me the advancements now.

14       A.    In I want to say early 2017, I was promoted to

15  FTO, field training officer.  Later in 2017 I was

16  promoted to corporal, and I was promoted to sergeant of

17  second shift I want to say in December of 2017.

18       Q.    And that was the position you were in in May

19  of 2018 when you left?

20       A.    I was sergeant of third -- I was on third

21  shift at the time --

22       Q.    Okay.

23       A.    -- but, yes, sir.

24       Q.    But you were a shift supervisor at that time?

25       A.    Yes, sir.

11

1      Q.   Okay.  As of October 2016, though, you were
2  still just a corrections officer or jailer.  Is that
3  fair to say?
4      A.   Yes, sir.
5      Q.   Okay.  Did you know Ms. Hulsey prior to
6  October 2016?
7      A.   No, sir.
8      Q.   Okay.  Did you know any of her family?
9      A.   No, sir.
10     Q.   Okay.  Have you met any of them since this
11  incident?
12     A.   Not to my knowledge.
13     Q.   Have you had any conversations with her
14  mother, Ms. Craig, or any of her family?
15     A.   No, sir.
16     Q.   What -- do you have any recollection of any
17  interaction you had with Ms. Hulsey?
18     A.   I do not, sir.
19     Q.   You've seen this now several times.  You are
20  the fourth deposition today, so I'm going to hand you
21  the Observation Cell Records, ask you to go through it.
22  If you see your signature or your initials on here, mark
23  it with a 4.  You can put a star and a 4.  Just make
24  sure that there is a 4 there so that we know that
25  particular entry pertains to you.

1      A.   (Complies.)

2      Q.   Did you mark any of them?  I wasn't paying

3 attention.

4      A.   No, sir.

5      Q.   Okay.  So based on the records then, you would

6 have not made any Observation Cell Records or Medical

7 Watch Log entries?

8      A.   No, sir.

9      Q.   All right.  Do you recall ever taking

10 Ms. Hulsey's vital signs?

11      A.   No, sir.

12      Q.   Okay.  Do you recall ever logging Ms. Hulsey's

13 vital signs?

14      A.   No, sir.

15      Q.   Have you reviewed any of the booking logs for

16 the time period that Ms. Hulsey was in the jail?

17      A.   Yes, sir.

18      Q.   All right.  Did you find any notations in

19 those logs where you had made any notations related to

20 Ms. Hulsey?

21      A.   I did not see any pertaining to Ms. Hulsey

22 that I made, no, sir.

23      Q.   I don't know if these are your initials, but

24 I'm going to hand you a page from October 8th, 2016,

25 and it looks like it's the first shift.  And the reason

1  I'm handing it to you is at the top it looks like

2  there's the name Paul on there, so...

3          Do you know -- is there another Paul that that

4  is referring to, or is that referring to you?

5      A.    No, sir, that would be me.

6      Q.    Okay.  Do you note on that same page that

7  there are some vital signs that are recorded for

8  Ms. Hulsey?

9      A.    There are, sir.

10     Q.    Okay.  Do you know whose initials are next to

11  the log entry?

12     A.    Those would be mine.

13     Q.    All right.  And I -- and I understand if you

14  don't have any specific recollection of it.

15          But after looking at that log entry and seeing

16  your initials, does that help refresh your recollection

17  at all about any vital signs being taken for Ms. Hulsey?

18     A.    Yes, sir.

19     Q.    No?

20     A.    Yes, sir.  I mean...

21     Q.    Yes, it refreshes your memory that they were

22  done.

23          Is that what you're trying to say?

24     A.    They were done.  I don't remember personally

25  doing them, but I remember -- I mean, I obviously wrote

1  them in the book.

2      Q.    That's your handwriting; you can recognize it?

3      A.    Yes, sir.

4      Q.    Okay.  Do you recall why Ms. Hulsey's vital

5  signs were taken on that day?

6      A.    I do not.

7      Q.    Okay.  Do you -- does the log entry reflect

8  that Ms. Hulsey is still in booking on that day?

9      A.    Yes, sir.

10      Q.    Do you know why she was still in booking as of

11  October the 8th, 2016?

12      A.    I do not, sir.

13      Q.    The only name that's listed on that shift

14  appears to be yours.  Is that correct?

15      A.    Yes, sir.

16      Q.    You weren't the only person working in the

17  jail that day, I take it, I hope?

18      A.    No, sir.

19      Q.    Do you know who else would have been working

20  that day?

21      A.    Not off the top of my head without looking at

22  this other logs from this day.

23      Q.    All right.  And the other logs would be the

24  control log?

25      A.    And the -- yes, sir, and the sally port log.

15

1    Q.   Okay.   Everybody that comes on shift, would
2  they be recorded in one of those logs?
3    A.   They should.
4    Q.   Okay.   And I know there's time record logs in
5  addition to that.
6    A.   Yeah.   They should be logged.   Like on this,
7  it would be logged on which area they were working.
8    Q.   Do you know why you're the only name that's
9  listed?
10        I notice most of the other ones would have
11  several different names listed.
12    A.   If I remember correctly, the sergeant and
13  corporal were either off or on vacation that week, and I
14  might have been the only one in the booking area at that
15  time --
16    Q.   Okay.
17    A.   -- would be my only explanation.
18    Q.   Okay.   Do you recall who your shift supervisor
19  would have been at that time?
20    A.   It would have been Sergeant Aaron and Corporal
21  Moore.
22    Q.   And if we go back and look at their time
23  sheets, it will tell us whether they worked that day or
24  didn't work that day, and may have vacation or may have
25  the reason why they were off that day?

1    A.   It should, sir, yes.

2    Q.   So we can go back and look at that to confirm

3 your recollection.

4         But what, if anything, did you do with the

5 information that's logged here, the vital signs?

6    A.   After logging the information in the book, we

7 would have handed this information over to Nurse Plank.

8    Q.   And that's first shift, so that would -- she

9 would have actually been present at the jail at that

10 time?

11   A.   The 8th, Saturday yes.

12   Q.   Did she work the weekends?

13   A.   I can't remember, sir.

14   Q.   Okay.

15   A.   I don't think so.

16   Q.   If she wasn't at the jail because it was a

17 weekend, what would you have done with this information?

18   A.   I would have called the nurse.

19   Q.   Okay.  How would that call have been placed?

20   A.   From the booking office, I would have called

21 her and informed her that Ms. Hulsey -- I would have

22 informed her of the symptoms Ms. Hulsey was complaining

23 about, which I do not remember at this time, and then I

24 would have told her we took vitals and what they were.

25   Q.   All right.  Do you know what the significance

1  of a blood pressure reading of 144 over 99 is?

2       A.   I'm not aware.

3       Q.   Okay.  Would it be your normal practice to

4  record other symptoms in addition to the vital signs?

5       A.   Not usually.

6       Q.   Do you have a recollection -- I know several

7  people have talked about her having bowel movements on

8  herself.

9            Do you have any recollection of dealing with

10 Ms. Hulsey having bowel movements on herself?

11      A.   I do not.

12      Q.   Do you recall what the nurse responded after

13 providing these vital signs to the nurse?

14      A.   I do not.

15      Q.   Would you have briefed the next shift that

16 came on that day about Ms. Hulsey's condition?

17      A.   Probably not if we just took the vitals and

18 the nurse did not give us any explicit directions.  But

19 we might have passed on that she wasn't feeling well.  I

20 cannot be -- I can't remember for sure.

21           (Mr. Key entered the room.)

22           MR. MOSELEY:  And I can read his shirt.  Just

23 for the record, Mr. Key has now entered the deposition.

24           Before we leave that, let me go ahead.  I'll

25 mark that -- I guess I'll just mark it Exhibit 1 to your

20

1                    **REPORTER'S CERTIFICATION**

2    STATE OF TENNESSEE   )
     COUNTY OF DAVIDSON   )
3

4            I, Cheryl H. Carter, LCR #315, RPR #820707,

5    CCR #137, licensed court reporter, in and for the State

6    of Tennessee, do hereby certify that the above

7    deposition transcript of JUSTIN PAUL was reported by me

8    on December 12, 2018, and that the foregoing pages of

9    the transcript are a true and accurate record to the

10   best of my knowledge, skills, and ability.

11           I further certify that I am not related to nor

12   an employee of counsel or any of the parties to the

13   action, nor am I in any way financially interested in

14   the outcome of this case.

15           I further certify that I am duly licensed by

16   the Tennessee Board of Court Reporting as a Licensed

17   Court Reporter as evidenced by the LCR number and

18   expiration date following my name below.

19

20

21                    /Cheryl H. Carter/
                      Cheryl H. Carter
22                    LCR #315, RPR #820707, CCR #137
                      LCR Expiration Date 6/30/18
23                    Accurate Court Reporting
                      P.O. Box 682683
24                    Franklin, Tennessee  37068
                      Signature Date: December 27, 2018
25