IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


MARGARET CRAIG, as next of        )
kin and personal representative   )
of the estate of Angela Hulsey,   )
                                  )
            Plaintiff,            )
                                  )
vs.                               )   No. 3:17-cv-01335
                                  )   JURY DEMAND
                                  )   JUDGE CAMPBELL
CHEATHAM COUNTY, TENNESSEE,        )   MAGISTRATE HOLMES
et al.,                           )
                                  )
            Defendants.           )

_____

**The deposition of**

**JESSICA (PLANK) TREICHLER**

**January 3, 2019**

_____


TAMI R. WEBB, RPR, LCR, CCR
ACCURATE COURT REPORTING
P.O. Box 682683
Franklin, TN  37068
(615) 244-DEPO or 244-3376
www.ACR-Nashville.com

91

1      A.    For example, nausea and vomiting.

2      Q.    Do you know if she had nausea and vomiting?

3      A.    She never asked -- told me she did.

4      Q.    Did you ever observe her have nausea --

5      A.    No.

6      Q.    -- or vomiting?

7            Any other symptoms?

8      A.    Perfuse sweating, goose bump skin, using the COWS

9  scale.

10     Q.    All right.  Did you ever observe her having

11  sweating or...

12     A.    No.

13     Q.    Aside from your notes, do you have an independent

14  recollection of your direct contact with Ms. Hulsey?

15     A.    I remember her.

16     Q.    Okay.  When was the first time that you had any

17  interaction with her regardless of whether it was around this

18  time or even before?

19     A.    No, the 10th.

20     Q.    Okay.  And what -- what's your first recollection?

21     A.    The conversation that I have documented.

22     Q.    So your only recollection is exactly what's in your

23  notes?

24     A.    Yes.

25     Q.    You have no other recollection of this beyond that?

92

1      A.    I never knew her prior to that, no.

2      Q.    All right.  Did you have any conversations with any

3    of the jail staff about Ms. Hulsey and her history?

4      A.    No.

5      Q.    Do you know what time you first saw Ms. Hulsey on

6    the 10th?

7      A.    If I recollect correctly, according to my notes, it

8    was upon my arrival, so chances are as I was walking through

9    at 6:00 in the morning.

10      Q.    And at that time was she in booking?

11      A.    Yes.

12      Q.    So sometime around 6:00 in the morning as you had

13    arrived, you encountered Ms. Hulsey?

14      A.    Uh-huh.

15      Q.    Is that a yes?

16      A.    Yes.

17      Q.    And what prompted any type of interaction with

18    Ms. Hulsey?

19      A.    She would have probably called me to the door.

20    That was not unusual.

21      Q.    So she was in her cell?

22      A.    Yes.

23      Q.    Okay.  Was there anybody else in her cell with her?

24      A.    I'm sure there was.  I don't recall.

25      Q.    Okay.  Did you have any conversations with anybody

93

1  else in her cell about her condition?

2       A.    No.

3       Q.    Do you have any recollection of what she looked

4  like at the time?

5       A.    Only general features, brown hair.

6       Q.    And do you know what observations you were able to

7  make about her condition?

8       A.    Just that it was a young woman who was talking to

9  me.  I just -- there was nothing observable through that pie

10 hole that would have led me to believe she was sickly.

11      Q.    So it was a solid door?

12      A.    No, at the time -- well, I don't think so.  At the

13 time, I think that was still a gated door.

14      Q.    All right.  So through the gated door then --

15      A.    Uh-huh.

16      Q.    -- instead of the pie hole?  Is that...

17      A.    Yes.

18      Q.    Okay.

19      A.    Yes.

20      Q.    Did you actually go to her or take her out?  How

21 did that interaction with her continue?

22      A.    It would have probably just been right there.

23      Q.    I think you took some vitals at that time?

24      A.    Uh-huh.

25      Q.    So did you take the equipment to her?

94

1     A.    I probably did.

2     Q.    Okay.  Do you have a recollection of taking her

3  vitals?

4     A.    Not -- only just my notes.

5     Q.    So apart from your notes, you don't have an actual

6  recollection of fitting the blood pressure cuff?

7     A.    No, not during that visit.

8     Q.    What was the -- the equipment then that was used in

9  order to take her vital signs?

10    A.    It would have been a manual blood pressure cuff, a

11 stethoscope, and probably a pulse ox.

12    Q.    And is the manual blood pressure cuff, is that

13 different than what the jail uses?

14    A.    Yes.

15    Q.    I think they use an automated --

16    A.    Yes.

17    Q.    -- type system.

18          Okay.  So other than referring to your notes and

19 knowing that you did take some vital signs, you don't have an

20 independent recollection of actually doing that?

21    A.    No.

22    Q.    Okay.  And you don't recall whether or not you took

23 her temperature at that time?

24    A.    No, I probably didn't.  If it's not in my notes, I

25 didn't do it.

1      Q.   Did you receive any reports from any of the

2 corrections officers that she had had bowel control issues at

3 the jail?

4      A.   Yes.

5      Q.   How many times?

6      A.   I know that she was brought back up to booking the

7 night of the 11th because she had bowel control in the dorm

8 and the other inmates were complaining about it.

9      Q.   Do you know whether or not Ms. Hulsey was reported

10 to have sweating during her detention at the jail?

11      A.   Not that I recall.

12      Q.   Do you know whether or not it was reported -- or

13 that she reported having weakness during her detention?

14      A.   Not that I recall.

15      Q.   Do you know if she had -- if she was too weak to

16 even be able to bathe herself?

17      A.   Not that I recall.

18      Q.   Do you know if Ms. Hulsey had any skin

19 discoloration during her time at the jail?

20      A.   Not that I recall.

21      Q.   I don't mean to make this a trick question, but I

22 think in one of your reports you do mention that her

23 fingertips turned blue.  You don't recall that?

24      A.   I would have to see the report.

25      Q.   Okay.  But you don't personally recall whether --

1  the back.  Inmate talkative and active.  Said would rather be

2  in the back where she could move around better.  I told her

3  as long as she is feeling well, I would let CO/sergeant know.

4  Visually inmate observed looking better and more active."  My

5  signature.

6      Q.   All right.  When you say "visually inmate looked

7  better, more active," compared to what?

8      A.   Obviously the day before.

9      Q.   All right.  What was -- what were your observations

10  the day before about her being active or how she looked?

11     A.   If I didn't write them down, I don't remember

12  specifically.  Obviously she was more active than the day

13  before.

14     Q.   And do you know what time that encounter took

15  place?

16     A.   It was probably -- and it's a guess -- but probably

17  as I was entering the jail that morning.

18     Q.   The next entry is 10/11/16.  It says "evening."  Go

19  ahead and read that one for us.

20     A.   "My sergeant, Mark Bryant, called.  Inmate not

21  feeling well.  Seems to be panicking.  Continued to have

22  issues with bowel movements; therefore again, brought to

23  booking, back to med ob.  Headache protocol used.  Will

24  follow up with intake."

25     Q.   All right.  What, if any, information can you

1    provide about the conversation?  Do you have an independent

2    recollection of that phone call?

3        A.    No.

4        Q.    What did it mean to you when he said that she

5    seemed to be panicking?

6        A.    That's unfortunately a normal part of anxiety in

7    jail life.

8        Q.    And the "continued to have issues with bowel

9    movements," what significance was there to that for you?

10       A.    Well, that's why she was brought back up is

11   because, per that recant, she had had bowel issues, so

12   therefore, she was brought back to med ob.

13       Q.    Per the statement by Mark Bryant?

14       A.    Uh-huh.

15       Q.    Is that a yes?

16       A.    Yes.

17       Q.    And then this last notation, "headache protocol

18   used."  Why was the headache protocol used?

19       A.    I would have to look at the headache protocol to

20   tell you that.  This was just a general addendum to any notes

21   that were taken.

22       Q.    Okay.  And all of that took place, it says

23   "evening," so is that after your shift was over?

24       A.    That's correct.

25       Q.    Okay.

1    A.    Chances are I didn't jot down a time when I made my
2  notes at home.
3    Q.    Okay.  Would you have started the headache protocol
4  that evening then?
5    A.    Uh-huh.
6    Q.    Is that a yes?
7    A.    Yes.
8    Q.    Okay.  So you would have instructed Mark Bryant to
9  use the headache protocol?
10   A.    Well, I would have instructed him what medication
11 to give according to the protocol.
12   Q.    Okay.  So you would have simply -- and I think in
13 this case it was Tylenol or something.
14   A.    Yes.
15   Q.    But whatever it was, you would have simply said,
16 give her such and such milligrams of Tylenol?
17   A.    Yes.
18   Q.    And then we have the next page, which has a date
19 and time, 10/12/16 at 8:30 a.m.  Is that correct?
20   A.    That's correct.
21   Q.    What's the plus or minus?
22   A.    Approximate, in other words.
23   Q.    Approximate, okay.
24   A.    Yeah.
25   Q.    When would you -- before we have -- before I have

1      A.    That's correct.

2      Q.    Okay.  Do you know when the entry on 10/12/16 --

3  when you filled this out?

4      A.    While she was in the shower.

5      Q.    Okay.  And I think it was -- one of the female

6  officers took her to do the shower?

7      A.    Yes.

8      Q.    Okay.  Go ahead, again, then and just read that for

9  us so that we make sure we know -- we have an accurate

10 understanding --

11     A.    Okay.

12     Q.    -- of what it says.

13     A.    "Inmate out of cell and at booking counter.  Is not

14 feeling well.  Reported to nurse that feels -- corporal

15 stated -- I'm panicking."  In other words, she didn't

16 directly tell me at that point; that's that the corporal told

17 me.  "Approached inmate.  Vital signs taken:  Blood pressure,

18 110 over 60; pulse, 92; oxygen, 97; respirations 18.  Appears

19 to be hyperventilating.  Reassured to calm self and control

20 breathing.  Asked if she wanted her second dose of Tylenol

21 for headache per protocol.  She stated yes.  Top of her head

22 was hurting.  Also discussed another bowel movement on self

23 and that she was embarrassed -- that embarrassing.  Asked her

24 where was the Pull-Ups.  She states COs didn't give.  Told

25 her I could not give her a shower but I would have CO come

1  and take cuffs off and give shower.  She then stated, 'I'm

2  going die.'  I told inmate she was not going to die.  I told

3  her to control her breathing and asked her again if she had

4  been using anything.  She admitted at that time" -- and then

5  I made a mistake in spelling so that's what the ER over

6  it means -- "fentanyl.  Told her after the shower, we would

7  see -- would see her to see what she could -- what else could

8  be done to make her more comfortable.  CO Stephanie was to

9  come and give shower.  Two Pull-Ups given to assist with

10 loose stool."  My signature and a star that says

11 "continue" -- "to continue med ob."

12      Q.   All right.  At that point what else would have been

13 protocol?  When you say "to see what else could be done to

14 make her more," what would be the protocol at that point?

15      A.   My -- my intention was then to get her in the

16 clinic, do the complete assessment as necessary, and she

17 would be put on withdraw protocol.  That was the intent.

18      Q.   Do you know that she still would have been in

19 withdrawal at this point?

20      A.   I can't make that assumption.

21      Q.   How long does it usually take for somebody to go

22 through withdrawal?

23      A.   Everyone is different.  It depends on the person,

24 what they're using, how much they use.  I don't know what

25 statistics, they say.

1   A.   When she got out of the shower.

2   Q.   Do you know when she got out of the shower?

3   A.   I do not know what time she got out of the shower.

4   Q.   All right.  Did you have instructions with the

5   officer who took her to the shower to bring her back to the

6   clinic?

7   A.   Yes.

8   Q.   Okay.  Do you know why she wasn't taken back to the

9   clinic?

10  A.   No.

11  Q.   You ultimately found her in her cell.  Correct?

12  A.   Well, I didn't find her personally.  I was not the

13  first one there, but yes.

14  Q.   The next time you saw her, she was in her cell?

15  A.   That's correct.

16  Q.   There's a notation on here, "blood pressure greater

17  than 140 over 90"?

18  A.   Uh-huh.

19  Q.   Okay.  And that's not marked.  And, again, you

20  didn't find that on the blood pressure?

21  A.   No.

22  Q.   Is -- is that going to be consistent with the

23  protocols, if somebody has a blood pressure greater than

24  that, that the doctor would be called?

25  A.   Yes.

1           Did you note what her pulse was at that point?

2      A.   I don't know that I wrote -- if I didn't write it

3  down, probably not.  This is an emergency situation, I'm not

4  worried about numbers.

5      Q.   Sure.  So the EMS were called?

6      A.   Yes.

7      Q.   I understand they arrived very quickly?

8      A.   Yes.

9      Q.   Okay.  You had the Ambu bag?

10     A.   Ambu, uh-huh.

11     Q.   That was used?

12     A.   Yes.

13     Q.   But no defibrillator or anything like that?

14     A.   No.

15     Q.   I assume the EMS arrived and then they took over?

16     A.   Yes.

17     Q.   Okay.  At what point did you -- were you no longer

18 with Ms. Hulsey?

19     A.   I stayed in the general vicinity until the

20 ambulance pulled off.  But I -- once the EMS arrived, her

21 care is passed off to them.  I stayed.  If they need

22 anything, I'm not going to walk away.  But I'm no longer a

23 participant in their care.  They have emergency knowledge

24 that I do not.

25     Q.   You have at the end of your report you've been told

158

1   per corporal -- again, is that Corporal Moore?

2       A.   I don't really know.  Probably whoever was on

3   shift.

4       Q.   All right.  That -- "Reported to him that she was

5   being transferred from local hospital."  Do you know if she

6   was taken to Ashland City first?

7       A.   Yes.  "Being transferred from local hospital, CMC

8   Ashland City."

9       Q.   Is that based on what he reported to you?

10      A.   Yes.

11      Q.   Okay.  You don't have independent knowledge of

12  that?

13      A.   No.

14      Q.   Okay.  And then she was then transferred to

15  Skyline?

16      A.   That's correct.

17      Q.   Did you have any other interaction with Ms. Hulsey

18  after that time?

19      A.   No.

20      Q.   Were you ever contacted by any of her medical

21  providers after that?

22      A.   No.

23          MR. MOSELEY:  Let's go ahead and make that the next

24  exhibit.  I think we're on 7.

25                          (10/12/16 Typewritten Report for

165

 1                    REPORTER'S CERTIFICATION

 2   STATE OF TENNESSEE    )
     COUNTY OF DAVIDSON    )

 3

 4          I, TAMI R. WEBB, LCR #330, RPR #54171, CCR #0460,

 5   licensed court reporter, in and for the State of Tennessee,

 6   do hereby certify that the above deposition of **JESSICA**

 7   **(PLANK) TREICHLER** was reported by me on January 3, 2019**,** and

 8   that the foregoing pages of the transcript are a true and

 9   accurate record to the best of my knowledge, skills, and

10   ability.

11          I further certify that I am not related to nor an

12   employee of counsel or any of the parties to the action, nor

13   am I in any way financially interested in the outcome of this

14   case.

15          I further certify that I am duly licensed by the

16   Tennessee Board of Court Reporting as a Licensed Court

17   Reporter as evidenced by the LCR number and the expiration

18   date following my name below.

19

20

21                         /Tami R. Webb/
                           ──────────────────────
22                         Tami R. Webb, RPR, LCR, CCR
                           RPR #54171, LCR #330, CCR #0460
23                         LCR Expiration Date 6/30/20
                           Accurate Court Reporting
24                         P.O. Box 682683
                           Franklin, TN  37068
25                         Signature Date:  January 13, 2019