IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MARGARET CRAIG, as next of kin and Personal representative of the estate of Angela Hulsey, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. 3:17-cv-01335 JUDGE CAMPBELL MAGISTRATE JUDGE HOLMES |
| CHEATHAM COUNTY, TENNESSEE, BEN MOORE, MARK BRYANT, STEPHANIE GIZZI-BELL, JESSICA PLANK; KEITH PFEIFFER, MICHAEL MONTGOMERY, JUSTIN PAUL; BRANDON REASONOVER; TASHA BIGGS; HARLEY GEROW; JOSH MARRIOTT; JEFFREY GOAD; JUDY KING; ROGER TEMPLE; JEFFY KEY; JAMES BARNUM; and JOHN DOES 1 and 2, | ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY DEMAND |
| Defendants. | ) | |

## MEMORANDUM OF FACTS AND LAW
## IN SUPPORT OF DEFENDANT CHEATHAM COUNTY, TENNESSEE'S
## MOTION FOR SUMMARY JUDGMENT

Comes Defendant Cheatham County, Tennessee ("County"), and submits the following Memorandum of Facts and Law in support of its Motion for Summary Judgment.

## SUMMARY OF THE ARGUMENT

Cheatham County is entitled to summary judgment because the County cannot be held vicariously liable under 42 U.S.C. § 1983 for alleged constitutional violations committed by its employees based on the doctrine of *respondeat superior*.

Rather, to impose liability against the County under 42 U.S.C. § 1983, Plaintiff must establish that the execution of a policy, practice, or custom of the County resulted in a violation of Ms. Hulsey's constitutional rights. However, no County official ever violated Ms. Hulsey's constitutional rights. Nor was an unconstitutional policy, practice, or custom of the County the basis of any alleged deprivation of Ms. Hulsey's constitutional rights. Finally, the Defendant training of its employees was adequate. For these reasons, the Court should dismiss the Plaintiff's claims against Cheatham County with prejudice.

## STATEMENT OF FACTS

Margaret Craig ("Plaintiff"), as next of kin and personal representative of the Estate of her daughter, Angela Hulsey ("Ms. Hulsey"), has sued Cheatham County under 42 U.S.C. § 1983 based on the alleged deprivation of Ms. Hulsey's right to necessary medical care during her detention at the Cheatham County Jail from October 6, 2016 to October 12, 2016. *See* Am. Compl., (D.E. No. 54), ¶¶ 4.1; 5.1; 5.7; 5.10 and 7.1. Ms. Hulsey passed away on October 26, 2016. *See id.* Plaintiff also alleges that the County failed to have proper policies and procedures related to the medical needs of detainees. *See id.* at ¶ 5.42. Plaintiff further contends that the County failed to train and supervise its employees who were on duty at various times during Ms. Hulsey's detention in the County Jail. *Id.* at ¶ 7.2.

The following is a summary of the relevant facts in the case from September 30, 2016, which was seven days before Ms. Hulsey was taken into custody by the Cheatham County Sheriff's Department, through October 12, 2016.

2

### 1. September 30, 2016

Ms. Hulsey's medical records indicate a lengthy history of intravenous ("IV") drug use. *See* **Exhibit A**, Deposition of Dr. Rathel Nolan ("Dr. Nolan Dep."), 8:18-21. On September 30, 2016, Ms. Hulsey was transported by ambulance to Gateway Medical Center ("Gateway") in Clarksville for an overdose on narcotics. *See* **Exhibit A**, Dr. Nolan Dep., 8:4-13. At the hospital, Ms. Hulsey's drug screen was positive for benzodiazepines, opiates, methamphetamine, and cannabis. *See id.* at 8:14-17. Additionally, Ms. Hulsey had multiple needle track marks on her skin, which were consistent with her lengthy history of IV drug use. *See id.* at 8:18-25. Cultures of Ms. Hulsey's blood were obtained, which showed gram positive cocci in her blood stream. *See id.* at 10:6-15.

Ms. Hulsey's treating physician determined that Ms. Hulsey needed *at least* 24 hours of inpatient care even before he had received Ms. Hulsey's finalized blood cultures. *See id.* at 13:8-13; 9:1-25. However, on October 1, 2016, before her treating physician received her finalized blood cultures, Ms. Hulsey left the hospital against medical advice. *See id.* at 9:1-25; 10:1 and 12:11-22. After Ms. Hulsey left the hospital against medical advice, on October 3, 2016, the final report for Ms. Hulsey's blood cultures came back as positive for Methicillin-resistant *Staphylococcus aureus*, or "MRSA." *See* **Exhibit B**, Deposition of Dr. Juli Horton ("Dr. Horton Dep"), Exhibit 2.

Both the Plaintiff's and Defendants' infectious diseases experts agree that as of September 30, 2016, Ms. Hulsey had endocarditis, which is an infection on one of the valves of her heart. *See* **Exhibit A**, Dr. Nolan Dep., 11:1-21; *see also* **Exhibit B**, Dr. Horton Dep., Exhibit 2. The Plaintiff's expert, Dr. Rathel Nolan, described endocarditis as follows:

…a little blood clot that forms on the heart. And those probably form normally and dissolve normally in every one every day. But you get a clot on the heart valve and the bacteria get into that clot and they tend to grow. The clot gets bigger and people - - as the heart beats, the valve opens and closes and it flicks the bacteria out into the circulation. So you have the bacteria in the blood stream and it can travel other places.

With [Ms. Hulsey's] kind of endocarditis it would be the lungs, which it apparently did. And eventually it will eat up and destroy the heart valve, which can have some hemodynamic consequences. It didn't really in her because she had a tricuspid valve endocarditis, which is a less important valve to your health and well-being than some of the others.

*See* **Exhibit A**, Dr. Nolan Dep., 11:3-19. Both the Plaintiff's and the Defendants' experts agree that the typical length of IV antibiotic treatment for someone with Ms. Hulsey's infection was at least four weeks of IV antibiotics. *See id.* at 13:8-25. Instead of remaining in the hospital for a condition that required at least four weeks of in-patient treatment, Ms. Hulsey left the hospital after one day.

**2. October 3, 2016**

On October 3, 2016, which was three days before she was taken into custody by the Cheatham County Sheriff's Department, Ms. Hulsey went to the emergency room at Centennial Medical Center ("Centennial") in Nashville with complaints of drooping of the left side of her face. *See* **Exhibit A**, Dr. Nolan Dep., 20:13-20; *see also* **Exhibit B**, Dr. Horton Dep., Exhibit 2. She again tested positive for opiates, methamphetamine, benzodiazepines, and cannabis in a urine drug screen. *See id.* Based on her elevated creatinine level, Ms. Hulsey was in acute renal failure. *See id.* Chest x-rays also revealed the presence of lower lobe pneumonia. *See id.* Ms. Hulsey's vital signs were normal and she did not have a fever, but her white blood cell count was high and her platelet count was low. *See id.* However, she was not admitted to the hospital. *See id.* Instead, she was diagnosed with Bell's Palsy and discharged. *See* **Exhibit A**, Dr. Nolan Dep., 20:21-

23; *see also* **Exhibit B**, Dr. Horton Dep., Exhibit 2. By that point, Dr. Nolan believes that Ms. Hulsey's infection had spread to her brain. *See id.* at **Exhibit A**, Dr. Nolan Dep., 22:20-23. Notwithstanding the fact that the Plaintiff's expert believes that Ms. Hulsey had an infection of her heart valve caused by MRSA that had spread to her brain, Ms. Hulsey's treating physician at Centennial did not make such a diagnosis. Instead, Ms. Hulsey was diagnosed with Bell's Palsy, which is an infection of the cranial nerves that results in facial weakness. *See* **Exhibit B**, Dr. Horton Dep., 24:14-17; *see also* **Exhibit A**, Dr. Nolan Dep., 23:5-12.

### 3. October 6, 2016

Cheatham County Deputy Jeremy Ethridge took Ms. Hulsey into custody on multiple outstanding warrants for failure to appear on Thursday, October 6, 2016 at approximately 12:50 p.m. *See* **Exhibit C**, Declaration of Johnny J. Hannah ("Hannah Decl."), ¶ 6. She was booked into the Cheatham County Jail at 1:12 p.m. that day. *See id.* During the booking process, a corrections officer asked Ms. Hulsey several health-related questions. In response to those questions, Ms. Hulsey denied that she was currently taking any medications. When asked if she had any injuries and/or illnesses requiring medical treatment, she only reported that she had fluid in her left knee and leg. *See id.* She denied having any seizures. She denied having taken any drugs in the previous 24 hours. *See id.* After she was booked into the Jail, Ms. Hulsey was housed in the dorm with the general female population. *See id.*

### 4. October 7 – 9, 2016

From Friday, October 7, 2016, through Sunday, October 9, 2016, Ms. Hulsey remained in the dorm with the general female population. However, she did not request

medical treatment during this time.  *See* **Exhibit C**, Hannah Decl., ¶ 5.

As of October 2016, Cheatham County had contracted with Quality Correctional Health Care (QCHC) to provide on-site health services to inmates and detainees in the Cheatham County Jail.  *See id.* at ¶ 3.  A nurse employed by QCHC, Defendant Jessica Plank, provided on-site coverage at the Jail for forty (40) hours per week.  *See id.* **Exhibit D,** Deposition of Jessica Plank ("Plank Dep."), 31:25-32:2.  Ms. Plank's regular hours of the jail were Monday through Friday from 6:00 a.m. to 2:30 p.m.  **Exhibit D,** Plank Dep., 31:25-32:2.  She also was available seven days a week, 24 hours a day by telephone on an as-needed basis in case any Sheriff's Office employees needed to reach her.  **Exhibit C,** Hannah Decl., ¶ 3.  Ms. Plank was supervised by a physician, Dr. Donald Kern.  *See id.*; **Exhibit D,** Plank Dep., 34:6-8.  Dr. Kern would visit the Cheatham County Jail once a week to see inmates and detainees.  *See id.*  Dr. Kern also was available on an on-call basis seven days a week, 24 hours a day.  **Exhibit C,** Hannah Decl., ¶ 3.

Inmates and detainees at the Cheatham County Jail are able to place sick calls on a daily basis.  *See id.* at ¶ 5.  Cells in the Jail are equipped with kiosks such that inmates and detainees can submit written requests for medical treatment.  The kiosk also allows the nurse and/or physician to communicate with the inmate or detainee regarding the request.  Angela Hulsey had used the kiosk to request medical care and correspond with the nurse at least eight times between April 29 and May 13, 2015 during a previous detention at the Cheatham County Jail.  *See id.*  Ms. Husley also used the intercom in her cell on June 25, 2015 to request medical treatment.  *See id.*  She again used the kiosk to request medical care on July 3, 2015.  *See id.*  Significantly, the Cheatham County Jail has no record of Ms. Hulsey using the kiosk to request medical care from October 6, 2016

### 5. October 10, 2016

Ms. Hulsey saw Ms. Plank for the first time on October 10, 2016. Ms. Plank described Ms. Hulsey experiencing bowel incontinence. During her evaluation of Ms. Hulsey, Ms. Plank asked Ms. Hulsey if she was detoxing. *See* **Exhibit D**, Plank Dep., Exhibit 3. Ms. Hulsey replied that she was not. Ms. Plank asked a correctional officer to assist Ms. Hulsey with showering. *See* **Exhibit D**, Plank Dep., Exhibit 3. Ms. Plank testified in her deposition that throughout Ms. Hulsey's detention, she repeatedly asked Ms. Hulsey if she was detoxing or "coming off drugs." *See* **Exhibit D**, Plank Dep., 90:4-6. Ms. Plank typically asked all detainees or inmates if they were detoxing or "coming off drugs." *See* **Exhibit D**, Plank Dep., 90:7-15. However, because bowel incontinence could be a sign of detox when coupled with other symptoms, such as nausea and vomiting, Ms. Plank attempted to confirm this information with Ms. Hulsey. *See id.* at 90:16-25; 91:1. And, according to Ms. Hulsey, she had experienced nausea and vomiting. *See id.* at 91: 2-3.

Ms. Plank's belief that Ms. Hulsey could have been detoxing are consistent with the deposition testimony of Plaintiff's expert. *See* **Exhibit A**, Dr. Nolan Dep., 25:25; 26:1-5. Specifically, Dr. Nolan agreed during his deposition that symptoms of drug withdrawal could have appeared similar to someone who had the same infection, bacteremia, as Ms. Hulsey. *See id.* at 25: 2-25; 26:1-5. Similarly, the Defendants' expert, Dr. Juli Horton would have expected Ms. Hulsey to have several non-specific, flu-like symptoms as of October 6, 2016, which are usually mimicked in someone experiencing withdrawal. *See* **Exhibit B**, Dr. Horton Dep., Exhibit 2. ("The symptoms of someone experiencing

withdrawal often mimic these symptoms, and it can be difficult for a trained medical professional to distinguish between whether someone is suffering from withdrawal or staph bacteremia."). Dr. Nolan testified that blood cultures were necessary to differentiate between whether someone had bacteremia or was an IV drug user. *See* **Exhibit A**, Dr. Nolan Dep., 18:19-21.

After Ms. Hulsey saw Ms. Plank on October 10, she was moved from the general population to a cell in the booking area where she could be observed on a medical watch. Corrections officers observe detainees on medical watch approximately once per hour. *See* **Exhibit C**, Hannah Decl., ¶ 7. Officers record the time of their observation and the detainee's activity they observe, and then initial the form. *See id.* The Cheatham County Jail records this information on two separate forms, one of which is provided by QCHC and one prepared by Cheatham County. *See id.*[1]

When officers began recording Ms. Hulsey's activities on October 10 at 2:00 p.m., she was sitting at the booking counter. *See* **Exhibit C**, Hannah Decl., ¶ 8. Between 3:00 and 9:15 p.m., she was either lying or sitting on a mat, taking a shower, or walking around in her cell. *See id.* When the third shift came on duty at 10:00 p.m. on October 10, 2016, Ms. Hulsey was lying down, but awake. *See id.* By 4:05 a.m. on Tuesday, October 11, 2016, Ms. Hulsey was asleep. *See id.*

**6. October 11, 2016**

Ms. Hulsey saw Ms. Plank again on October 11, 2016. Ms. Plank recorded the following observations of Ms. Hulsey:

> IM [inmate] states she feels better - begging to go to back – IM talkative & active – would rather be in back where she could move around better – I

---

[1] The County's Medical Watch Inmate Activity Logs are attached to Mr. Hannah's Declaration at HULSEY56-66. OCHC's Observation Cell Records are attached at HULSEY67-74.

told her as long as feeling well – I would let CO/Sarg [corrections officer/sergeant] know – Visually IM does look better & more active.

*See* **Exhibit D**, Plank Dep., Exhibit 3.  Ms. Hulsey remained in general population for the next several hours until she experienced an episode just before 9:40 p.m. on October 11, 2016.  *See* **Exhibit E**, Deposition of Harley Gerow ("Gerow Dep.") 47:2-9; *See* **Exhibit F**, Deposition of Tia Alexis Newman ("Newman Dep.") 21:21-22:5.  While she was in the general population dorm, Ms. Hulsey asked a corrections officer, Harley Gerow Durham ("Officer Gerow"), to check her vital signs.  *See* **Exhibit E**, Gerow Dep., 45:18-24; 46:14-18.  Ms. Hulsey told Officer Gerow that she was not feeling well and that she "didn't do good with staying sober."  *See id.*    An inmate in Ms. Hulsey's cell, Tia Newman, recalls Ms. Hulsey saying that she did not feel well.  *See* **Exhibit F**, Newman Dep., 21:21-22:5.  Ms. Newman testified that she remembers Ms. Hulsey telling Officer Gerow and another officer on duty, Sgt. Mark Bryant, that she felt like she was dying. *See* **Exhibit F**, Newman Dep., 19:20-20:11; 21:14-20.  Both Officer Gerow and Sgt. Bryant deny Ms. Hulsey making this statement.  *See* **Exhibit E**, Gerow Dep., 46:19-21; *see also* **Exhibit G**, Deposition of Mark Bryant ("Bryant Dep.") 51:21-23.

While Officer Gerow was taking Ms. Hulsey's blood pressure, Ms. Hulsey experienced what appeared to Officer Gerow and Ms. Newman to be a seizure.  *See* **Exhibit E**, Gerow Dep., 47:2-9; *See* **Exhibit F**, Newman Dep., 21:21-22:24.  Ms. Newman testified that Ms. Hulsey started shaking and then fell backwards.  *See* **Exhibit F**, Newman Dep., 24:2-24.  Officer Gerow attempted to prevent Ms. Hulsey from falling and hurting herself.  *See* **Exhibit E**, Gerow Dep., 47:2-9.  With the assistance of another inmate, Officer Gerow was able to ease Ms. Hulsey to the floor until she ceased what Officer Gerow described as a "seizure."  *See* **Exhibit E**, Gerow Dep., 48:22-49:4.  Officer

Gerow radioed for her supervisor, Sgt. Mark Bryant, to come to the cell to assist. *See* **Exhibit E**, Gerow Dep., 49:1-6; *see also* **Exhibit F**, Newman Dep., 24:20-25:11.

Before Sgt. Bryant arrived, Ms. Gerow and another inmate were able to safely move Ms. Hulsey to her bunk. *See* **Exhibit E**, Gerow Dep., 49:12-14. When Sgt. Bryant arrived in the dorm, Officer Gerow described Ms. Hulsey's event. *See* **Exhibit E**, Gerow Dep., 50:1-10. According to Officer Gerow, Sgt. Bryant attempted to speak with Ms. Hulsey, but she had difficulty speaking because her tongue was hanging out of her mouth. *See* **Exhibit E**, Gerow Dep., 50:1-15; *see also* **Exhibit F**, Newman Dep., 25:8-19. According to Ms. Newman, Sgt. Bryant instructed Ms. Hulsey to "put her tongue back in her mouth and go lay down." *See* **Exhibit F**, Newman Dep., 26:20-25. On the other hand, Sgt. Bryant denies that he saw Ms. Hulsey having a seizure or anyone tell him that she experienced a seizure. *See* **Exhibit G**, Bryant Dep., 45:25-46:5. Sgt. Bryant also denies that Ms. Hulsey had her tongue hanging out of her mouth or any difficulty speaking with him. *See* **Exhibit G**, Bryant Dep., 50:21-25.

In addition to the different recollections of the people who either witnessed Ms. Hulsey's episode or observed her after it happened on October 11, 2016, there is a difference in opinion between the medical experts as to whether Ms. Hulsey actually experienced a seizure. *See* **Exhibit A,** Dr. Nolan Dep., 29: 7-17; *see also* **Exhibit B**, Dr. Horton Dep., 51:1-25; 52:1-6. The Plaintiff's expert, Dr. Nolan, has described the episode as a seizure. However, he admits that he could not diagnose someone as having a seizure based solely on a third-hand account of a layperson observing the alleged event. *See* **Exhibit A,** Dr. Nolan Dep., 29: 7-17. The Defendants' expert, Dr. Juli Horton, believes that the event described was a syncopal (fainting) episode. *See* **Exhibit B**, Dr.

Horton Dep., 51:1-11. Dr. Horton bases her opinion in part on the fact that Ms. Hulsey never lost consciousness or suffered a period of unresponsiveness based on the testimony that Ms. Hulsey was able to answer questions. *See id.* at 51:19-52:6.

Regardless of whether Ms. Hulsey experienced a seizure or syncopal episode that evening, it is indisputable that after the event, Sgt. Bryant called Ms. Plank at home at 9:45 p.m. to report what he knew about Ms. Hulsey's condition. *See* **Exhibit E**, Gerow Dep., 51:14-25; *see also* **Exhibit G**, Bryant Dep., 48:23-25. Sgt. Bryant testified in his deposition that he told Ms. Plank that Ms. Hulsey was complaining of pain, that she did not feel well, and that she was panicking. *See* **Exhibit G**, Bryant Dep., 44:13-17; 56:21-23. Sgt. Bryant had taken Ms. Hulsey's vital signs, which were normal, and gave that information to Ms. Plank. *Id.* at 45:6-12. Ms. Plank directed Sgt. Bryant to give Ms. Hulsey Tylenol and place her on medical watch. *Id.* at 46:9-12; 47:5-7. The Jail's medication administration records confirm that Ms. Hulsey received Tylenol on October 11, 2016. *See* **Exhibit D**, Plank Dep., 128:16-21 and Exhibit 5. Mr. Bryant then took Ms. Hulsey from her dorm to the booking area at 9:50 p.m. so she could be placed on medical watch again. *See* **Exhibit G**, Bryant Dep., 47:11-15.

Ms. Plank's wrote in her notes that Sgt. Bryant had called her the evening of October 11 to report that Ms. Hulsey was not feeling well, and that she seemed to be panicking. She wrote that Ms. Hulsey continued to have issues with bowel movements. Therefore, Ms. Hulsey was again brought to the booking area for observation. Ms. Plank told Sgt. Bryant to give Ms. Hulsey Tylenol per QCHC's treatment protocol for headaches, which he did. *See* **Exhibit D**, Plank Dep., Exhibit 3. Ms. Plank did not give Sgt. Bryant any further instructions or refer the matter to Dr. Kern. **Exhibit D**, Plank Dep., 145:17-20.

The Jail's third shift began observing Ms. Hulsey on October 11, 2016 at 10:00 p.m. *See* **Exhibit C**, Hannah Decl., ¶ 9. At that time, she was lying down on a mat. *See id.* Officers observed her lying down or sitting on her mat between 10:00 p.m. on October 11 and 5:10 a.m. on Wednesday, October 12, 2016. *See id.*

### 7. October 12, 2016

When the first shift began observing Ms. Hulsey at 6:00 a.m. on October 12, 2016, she was lying down. At 6:52 a.m., she was sitting up on her mat. *Id.*

At approximately 8:30 a.m., Ms. Hulsey told Officer Brandon Reasonover that she was not feeling well and that she wanted to see the nurse. Officer Reasonover notified his supervisor, Corporal Ben Moore, who instructed him to get the nurse. Officer Reasonover walked outside the building to find Ms. Plank. **Exhibit H**, Reasonover Dep., 23:8-17. Ms. Plank observed that Ms. Hulsey was breathing heavily. *See* **Exhibit D**, Plank Dep., Exhibit 7. After taking Ms. Hulsey's blood pressure, Ms. Hulsey told Ms. Plank that she had used heroin and fentanyl before arriving at the Jail. Ms. Hulsey also asked for two Tylenol tablets, which Ms. Plank gave her. *See id.* Ms. Hulsey then had another bowel movement on herself. *See id.* Ms. Plank instructed Officer Stephanie Gizzi-Bell to assist Ms. Hulsey with a shower. *See id.* Ms. Plank then requested Ms. Hulsey's booking sheet and told Ms. Hulsey that she would conduct an assessment after she completed her shower. *See id.*; *see also* **Exhibit D**, Plank Dep., 151:14-24. Officer Gizzi-Bell knew that Ms. Hulsey was not feeling well, so she stayed in the shower with her to assist her. **Exhibit I**, Gizzi-Bell Dep., 16:11-17:11.

After Ms. Hulsey had showered and returned to her cell, at approximately 9:10

a.m., Ms. Hulsey was verbally unresponsive to repeated calls for her attention. *See* **Exhibit D**, Plank Dep., Exhibit 7, 152:14-22; 153:16-18. When Ms. Plank entered Ms. Hulsey's cell, she described Ms. Hulsey as "drooling with head to the left." *Id.*; *see also* **Exhibit D**, Plank Dep., 153:8-10. Ms. Hulsey was also unresponsive to an ammonia capsule. *Id.* at 154:18-21. Ms. Plank observed that Ms. Hulsey's fingertips were cyanotic. *Id.* at 155: 19-21; 156:1-24. She had agonal breathing attempts. Her pulse was weak. *See id.* Further, no reading could be noted from the pulse oximeter. *See id.* Ms. Plank instructed a corporal to call 911. *See* **Exhibit D**, Plank Dep., Exhibit 7. Ms. Plank began CPR. *See id.* Ms. Hulsey was transported by ambulance to Skyline Medical Center in Nashville, Tennessee. *See id.* Ms. Hulsey suffered a cardiac arrest, sepsis due to MRSA, severe sepsis with septic shock, pneumonia, acute and subacute infective endocarditis, and anoxic brain damage. After Ms. Hulsey's condition did not improve, she was transferred to Alive Hospice, where she passed away on October 26, 2016. Ms. Hulsey's most likely cause of death was an anoxic brain injury related to septic shock. *See* **Exhibit B**, Dr. Horton Dep., 53:9-16 and Exhibit 2.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When the material facts are undisputed, there is nothing to submit for a jury's resolution and the matter is one of law to be decided by the court. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505 (1986); *Celotex v. Catrett*, 106 S. Ct. 2548 (1986).

The moving party has the initial burden of persuading the court that there is no genuine issue as to any material fact. *Celotex*, 106 S. Ct. at 2553. Once the moving

party makes a properly supported motion, however, the nonmoving party has the burden to set forth specific facts by way of affidavit or other appropriate discovery methods, establishing that disputed material facts do exist. *Anderson*, 106 S. Ct. at 2514.

The nonmoving party may not rely on legal conclusions, or the allegations or denials set forth in his pleadings. *Id.*; *See Cloverdale Equip. Corp. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir. 1989). In order to defeat summary judgment, a plaintiff must come forward with more persuasive evidence to support his claim than would otherwise be necessary; the "mere possibility" of a factual dispute is not enough. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 581-82 (6th Cir. 1992).

A court deciding a summary judgment motion should view the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587(1986). Where the record taken as a whole cannot lead a rational trier of fact to be able to find for the non-movant, there is no genuine issue of fact for trial. *Id.*

## **ARGUMENT**

I.      **THE COUNTY IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE PLAINTIFF CANNOT SHOW THAT MS. HULSEY'S CONSTITUTIONAL RIGHTS WERE VIOLATED AS THE RESULT OF ANY CHEATHAM COUNTY POLICY, PRACTICE, OR CUSTOM.**

A.      **Cheatham County cannot be liable under *respondeat superior*.**

A city or municipality may be "liable under section 1983 only where the municipality itself causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). For purposes of Plaintiff's section 1983 claim, Cheatham County cannot be held vicariously liable pursuant to 42 U.S.C. § 1983 for constitutional torts allegedly committed by its employees based on the doctrine of *respondeat superior*. *See Monell*

*v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1968).  In this regard, the United States Supreme Court has stated as follows:

> [T]he language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.  In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

*Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1968) (emphasis in original)*; See also Hale v. Randolph*, No. 1:02-CV-334, 2004 WL 1854179, at *10 (E.D. Tenn. Jan. 29, 2004) (stating, "There is no respondeat superior liability under section 1983 for governmental entities.") (citing numerous cases from the United States Supreme Court and the Sixth Circuit Court of Appeals).  Thus, the Plaintiff cannot recover under section 1983 for any alleged harm caused by one or more employees of Cheatham County on a *respondeat superior* theory.

Instead, a plaintiff seeking to subject a city or municipality to section 1983 liability for the actions of its employees must show that the employee was acting pursuant to an official policy or custom of the municipality.  *See Monell*, *supra*, at 690-91.  Simply stated, "it is when the execution of a government's policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.  Alternatively, a city or county "may be liable under § 1983 for a single decision by its properly constituted legislative body – whether or not that body had taken similar action in the past or intended to do so in the future – because even a single decision by such a

body unquestionably constitutes an act of official government policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

Thus, in order to establish liability against Cheatham County under 42 U.S.C. § 1983, the Plaintiff must establish that the execution of a County policy or custom resulted in the alleged violation of Ms. Hulsey's constitutional rights. *See Hale*, 2004 WL 1854170, at *10 (stating that a plaintiff pursuing a claim against a governmental entity under § 1983 must establish a direct causal link between the governmental entity's policy or custom and the alleged deprivation of his constitutional rights). In other words, the Plaintiff must demonstrate that Cheatham County itself was the "moving force" behind the alleged constitutional deprivation such that a "policy or custom" of Cheatham County is implicated. *See Kentucky v. Graham*, 473 U.S. 159, 167 (1985).

**B.    No County employee was ever deliberately indifferent to Ms. Hulsey's serious medical needs.**

When a deliberate indifference claim is asserted on behalf of a pretrial detainee pursuant to the due process clause of the Fourteenth Amendment, there is both an objective and subjective part to a claim. *See Day v. DeLong*, 358 F. Supp. 3d 687, 702 (S.D. Ohio 2019), reconsideration denied, No. 3:16-CV-437, 2019 WL 1081348 (S.D. Ohio Mar. 7, 2019). The Plaintiff must demonstrate the existence of a sufficiently serious medical need to satisfy the objective component. *See id.* (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)). "A medical need is sufficiently serious if it has been diagnosed by a physician that has mandated treatment or is so obvious that even a layperson would recognize the need for medical treatment." *Id.* (citing *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004)).

The Plaintiff also must demonstrate that the County official possessed a sufficiently culpable state of mind in denying medical care to satisfy the subjective component. *See id.* (citing *Spears v. Ruth*, 589 F.3d 249 (6th Cir. 2009)). As an example, "[a] defendant has a sufficiently culpable state of mind if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). In order to demonstrate deliberate indifference, plaintiff must prove the [official]:

    (1) subjectively knew of a risk to the inmate's health;

    (2) drew the inference that a substantial risk of harm to the inmate existed; and

    (3) consciously disregarded that risk.

*Id.* Further, "[a] plaintiff need not show that the defendant acted with the very purpose of causing harm but must show something greater than negligence or malpractice..." *Id.* (citing *Rouster v. County of Saginaw*, 749 F.3d 437, 447 (6th Cir. 2014)).

To the extent that the Plaintiff contends that any County official failed to recognize or diagnose Ms. Hulsey's infection, that is not enough to establish deliberate indifference. *Id.* at 702-703. "In order to show deliberate indifference, a plaintiff must show more than negligence or misdiagnosis of an ailment, i.e., when a prison doctor provides treatment, carelessly or inefficaciously to a prisoner, he has not displayed a deliberate indifference to the prisoner's need but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Id.* (citing *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001)). "Even the failure to follow internal policies, without more, does not constitute deliberate difference." *Id.* (citing *Meier v. County of Presque Isle*, 376 F. App'x 524, 529

(6th Cir. 2010) (noting that an awareness of a policy and the failure to comply with it "is not a per se constitutional violation")).

**C.     The Plaintiff cannot establish the subjective component of her claim.**

Cheatham County admits that the Plaintiff can satisfy the objective prong of her claim.  Ms. Hulsey's endocarditis has an objectively serious medical condition.  *North v. Cuyahoga County*, 754 Fed. Appx 380, 387 (6th Cir. 2018).

However, the Plaintiff has an impossible task in attempting to establish that any County official was deliberately indifferent towards Ms. Hulsey's serious medical needs.  When she arrived at the Jail on October 6, 2016, she had a serious blood infection that had gone untreated for several days because she left Gateway Medical Center in Clarksville on October 1, 2016 against medical advice.   She also was a chronic IV drug user.   Both infectious diseases experts agree that Ms. Hulsey could have been experiencing flu-like symptoms as of October 6, 2016, which could have been a sign of drug withdrawals or a blood infection.  Dr. Nolan testified in his deposition that you would need blood cultures to differentiate between the two.  There is no better way to illustrate how difficult it was to determine that Ms. Hulsey had a serious blood infection then by looking at her visit to Centennial Medical Center on October 3, 2016.  Ms. Hulsey went to the emergency room with a serious blood infection that needed four weeks of IV antibiotic therapy and was discharged the same day with a diagnosis of Bell's Palsy.

It is undisputed that Ms. Hulsey looked sick while she was at the Jail from October 6 – 12, 2016.  It is also indisputable that Ms. Hulsey had access to on-site medical care the entire time she was in jail.  Ms. Hulsey was clearly familiar with the jail's sick call procedures based on her prior detentions in the jail.  Ms. Hulsey was seen by the nurse on duty on October 10.  She was seen by the nurse again on October 11.  When officers

observed an event the evening of October 11 that gave them concern, Sgt. Bryant contacted the nurse at home to relay information about Ms. Hulsey's condition. Officers observed Ms. Hulsey on medical watch on an hourly basis for much of the day on October 10 and 11 and the morning of October 12. Ms. Hulsey saw the nurse again on October 12. Officers gave Ms. Hulsey Tylenol per the nurse's instructions. The Plaintiff cannot show that any County official ignored Ms. Hulsey's request to see the nurse. The Plaintiff cannot show that any County official failed to follow the nurse's instructions regarding Ms. Hulsey's care. The Plaintiff cannot show that any County official perceived a substantial risk to Ms. Hulsey's health and then <u>ignored</u> that risk.

Cheatham County anticipates that the Plaintiff will respond that Sgt. Mark Bryant was deliberately indifferent to Ms. Hulsey's serious medical needs by not telling Ms. Plank during their call on October 11, 2016 that Ms. Hulsey had just suffered a seizure, which could have affected Ms. Plank's recommendation for further treatment. That argument is a difficult one to make when Sgt. Bryant called the nurse while she was at home at 9:45 p.m. to report what he knew about the Plaintiff's symptoms, which included her being in pain, feeling sick, and panicking. It is even more difficult to make in light of the fact that the Sixth Circuit rejected this very argument last year in *Winkler v. Madison County*, 893 F.3d 877, 895 (6th Cir. 2018), in which the Court upheld the grant of qualified immunity to a deputy whom the Plaintiff claimed withheld information from the jail's doctor during a call. Ms. Plank believed that the appropriate course of action at that time was to treat Ms. Hulsey's symptoms in accordance with QCHC's protocols for headaches and give her Tylenol, which is what Sgt. Bryant did. There is no evidence that Ms. Plank asked Sgt. Bryant to obtain any additional information regarding Ms. Hulsey or that he failed to

comply with such a request. When Sgt. Bryant responded to Ms. Hulsey's medical event on October 11, 2016 by asking for and following the advice of a health care professional that he believed to be capable of assessing and addressing any risk to Ms. Hulsey, then he could not have committed any act of deliberate indifference in following her recommendations. *Winkler v. Madison County*, 893 F.3d 877, 895 (6th Cir. 2018); *McGaw v. Sevier County*, 715 Fed. Appx. 495, 498-99 (6th Cir. 2017). Because no County official was deliberately indifferent to Ms. Hulsey's serious medical needs, Cheatham County is entitled to summary judgment.

**D.      Cheatham County had appropriate policies, practices and customs in place for medical services at the Cheatham County Jail.**

"If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Winkler v. Madison Cty.*, 893 F.3d 877, 899 (6th Cir. 2018) (citing *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001)). For this reason, the Court should dismiss Cheatham County without having to address *Monell* liability. However, even if a County official was deliberately indifferent to Ms. Hulsey's service medical needs, which the County denies, the County's policies, practices and customs could not have been the cause of any alleged deprivation.

As discussed in the Declaration of Cheatham County's Jail Administrator, Johnny J. Hannah, Cheatham County had policies and procedures in place to allow inmates and detainees access to medical care. It contracted with QCHC to have a nurse on-site 40 hours per week. It had a physician on-site one day a week. The nurse and physician were always on call. The County provided kiosks to allow inmates and detainees to request medical care and communicate with the nurse. Ms. Hulsey clearly knew how to use the kiosk to request medical care and correspond with the nurse. Again, there are

no allegations that any County official delayed or denied Ms. Hulsey access to medical care. The Plaintiff simply cannot establish any systemic County deficiencies that rise to the level of deliberate indifference to serious medical needs in violation of Ms. Hulsey's Fourteenth Amendment rights.

**E.      The County's training of its employees was adequate.**

In the Amended Complaint, Plaintiff asserts that the County is liable for Ms. Hulsey's alleged harm because it failed to "provide its employees with adequate training, supervision, policies and procedures that would have provided the medical care that [Ms. Hulsey] needed …" *See Am. Compl.*, ¶ 7.2.

The alleged inadequacy of training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) (internal quotations omitted). A municipality can be liable under § 1983 only where its policies are the moving force behind the constitutional violation. *Id.* at 389 (internal quotations omitted). Only where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. *Id.* (internal quotations omitted).

In order to succeed on a "failure to train" theory against Cheatham County, the Plaintiff must show three elements: (1) that officers' training was inadequate to prepare them for the tasks that officers in their position must perform; (2) that the inadequacy persisted due to the County's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the injury at issue. Of note, if no constitutional

violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

As relevant to this matter, the Sixth Circuit has determined that deliberate indifference was not established where non-medical personnel passed inmate medical requests along to the appropriate medical personnel and did not attempt to assess the inmate's medical needs on their own. *See North v. Cuyahoga County*, 754 F. App'x. 380, 393 (6th Cir. 2018). In *North*, a twenty-one year old inmate suffered a stroke caused by untreated endocarditis. *Id.* at 382. He filed suit against the medical and correctional staff at the jail, alleging deliberate indifference to his serious medical needs. *See id.* The district court granted summary judgment, finding no constitutional violation, and dismissed the claims against the individual defendants and the Defendant, Cuyahoga County. On appeal, the plaintiff challenged "only the dismissal of his *Monell* claim against the County, arguing that the County's policies, customs and failure to train its employees deprived him of his right to constitutionally adequate medical care." *Id.* In affirming the district court's order, the *North* court explained the factors considered in determining that there was no deliberate indifference based on the evidence before the court. Specifically, the court analyzed:

> Although COs exercised some discretion, they typically passed inmate medical requests along to the medical unit and did not attempt to assess the inmate's medical needs on their own. Furthermore, inmates were able to request medical care through the kite system and did not have to rely on COs to access care. Failing to provide COs with additional medical training, therefore, does not constitute deliberate indifference in this case.

*North v. Cuyahoga County*, 754 F. App'x. 380, 393 (6th Cir. 2018). The Sixth Circuit's decision establishes that delegation of medical care to a contracted company and an

independent system for the inmates to request medical care do not support a failure to train theory of deliberate indifference.

Here, like in *North*, the County provided adequate medical care through a contracted company, QCHC, and its assigned employee, Jessica Plank. As explained by Johnny Hannah, all incidents short of an emergency where an inmate was transported to a medical facility were handled by the contracted medical company, and specifically, Ms. Plank. **Exhibit J,** Dep. of Johnny Hannah, 46:9-16. As shown in the *North* case, it is acceptable for a county to delegate its medical care services of inmates/detainees to a third party health care provider. Thus, the County's delegation of its medical care services was also appropriate in this case. The Plaintiff's failure to train claim is without merit.

<u>CONCLUSION</u>

WHEREFORE, Defendant Cheatham County, Tennessee respectfully requests that the Court enter an order granting its Motion for Summary Judgment and dismissing Plaintiff's claims against it with prejudice.

Respectfully submitted,

*/s/ Jeffrey M. Beemer*
Jeffrey M. Beemer, #17247
Ariel M. Kelly, #34340
Dickinson Wright PLLC
Fifth Third Center, Suite 800
424 Church Street
Nashville, TN 37219
(615) 244-6538
Email: JBeemer@dickinsonwright.com
Email: AKelly@dickinsonwright.com

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court on June 12, 2019, using the CM/ECF system, which will send notification to all counsel of record as listed below:

James Bryan Moseley, Esq.
Moseley & Moseley
237 Castlewood Drive, Suite D
Murfreesboro, TN 37219

Raymond T. Throckmorton, III, Esq.
Law Office of Raymond T. Throckmorton, III
2016 8th Avenue South
Nashville, TN 37204

Marc O. Dedman, Esq.
Spicer Rudstrom, PLLC
414 Union Street, Suite 1700
Nashville, Tennessee 37219

Robyn Beale Williams, Esq.
Cassandra M. Crane, Esq.
Farrar & Bates, LLP
211 Seventh Ave. N, Suite 500
Nashville, Tennessee 37219

*/s/ Jeffrey M. Beemer*
Jeffrey M. Beemer

NASHVILLE 38391-783 691708v1