# EXHIBIT B

```
           IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF TENNESSEE
                   NASHVILLE DIVISION
```

MARGARET CRAIG, as next of      )
kin and personal                )
representative of the estate    )
of Angela Hulsey,               )
                                )
          Plaintiff             )
                                )
vs.                             )   Case No. 3:17-cv-01335
                                )   JURY DEMAND
                                )   JUDGE CAMPBELL
CHEATHAM COUNTY, TENNESSEE,     )   MAGISTRATE HOLMES
BEN MOORE, MARK BRYANT,         )
STEPHANIE GIZZI-BELL, JESSICA   )
PLANK, et al.,                  )
                                )

          Defendants

---

**The deposition of**

**JULI GARNER HORTON, M.D.**

May 29, 2019

---

CHERYL H. CARTER, RPR, LCR, CCR
Accurate Court Reporting
P.O. Box 682683
Franklin, TN 37068
(615) 244-DEPO or 244-3376
www.ACR-Nashville.com

1  prior to departing, and most significantly she had staph
2  infection in her blood.
3      Q.   All right.  In terms of the -- item number two
4  on your list, the medical records from Centennial
5  Medical Center, what information were you able to garner
6  from those records to help influence your opinions in
7  this case?
8      A.   Well, they were interesting.  She -- she
9  presented there with a different symptom, had a really
10 pretty extensive emergency department evaluation, which
11 was notable for acute kidney injury, and given a
12 diagnosis of Bell's palsy, had a lot of imaging done
13 that was all normal, and then discharged.
14     Q.   And what is Bell's palsy?
15     A.   Bell's palsy is typically a viral infection
16 affecting cranial nerves that result in facial weakness.
17 Transient typically.
18     Q.   Based on what you know, do you have an opinion
19 one way or the other whether or not the diagnosis of
20 Bell's palsy was accurate?
21     A.   I -- I'm not sure.  She -- there certainly
22 wasn't any other explanation for her symptoms, but it
23 seems awfully coincidental in that it would not have any
24 relation to all the other things that we know afflicted
25 her, so...

1  Q.  Based on the information that you've reviewed,
2  do you know what other cause there could be for the I'll
3  just call it an apparent seizure or a seizure-like event
4  that Ms. Durham described on October 11th, 2016?
5  A.  I think she may have been -- this may have
6  been more -- I'm not sure it was a seizure based on the
7  description and may have been more what we call
8  syncopal, so kind of get up too fast and you have low
9  blood pressure and get woozy and have to sit back down.
10 So I think it may have been a blood-pressure-related
11 phenomenon.
12     Q.  All right.  What was the particular
13 description that you believe Ms. Durham gave in her
14 deposition about this incident?
15     A.  That she had -- that she was shaking.  I think
16 she had -- I can't remember if she had some eye rolling
17 and that somebody said that her -- that her tongue was
18 protruding.
19     Q.  All right.  Is that not consistent with a
20 seizure?
21     A.  Those can be signs of a seizure.  Typically
22 there's also a period of unresponsiveness, wouldn't be
23 able to assist -- I think someone was assisting her in
24 sitting down -- or be able to assist people in helping
25 you, would be more -- would be hallmarks that go along

1 with seizures.

2     Q. All right. Do you know if she was
3 unresponsive during that time?

4     A. I believe there was some testimony that she
5 was answering questions or answer -- responding in some
6 way.

7     Q. Do you know what was being done at the time
8 that she exhibited these seizure-like symptoms to
9 Ms. Durham?

10         MR. BEEMER: Object to the form.

11     A. I'm not sure I specifically recall.

12     Q. (By Mr. Moseley) Okay. Do you recall if her
13 vital signs were being taken?

14     A. I don't recall.

15     Q. In your opinion, is that event a sign of a
16 serious medical condition?

17     A. It could be a sign of a serious medical
18 condition. I think syncopal episodes happen frequently
19 and often resolve, and they're not serious medical
20 conditions. Again, working on the description of this,
21 I think it's difficult to say.

22     Q. You're aware that Ms. Durham described it as a
23 seizure event?

24     A. Yes.

25     Q. Okay. Assuming it was a seizure event, would

1  you consider that a serious medical condition?
2       MR. BEEMER:  Object to the form.
3       MS. WILLIAMS:  Same.
4       A.   If she had had a seizure, yes.
5       Q.   (By Mr. Moseley)  And would the proper
6  response have been to either contact a doctor or take
7  her to the hospital?
8       A.   Yes.
9       Q.   Going to the, I guess, second to the last
10 paragraph on the last page of your report, it's your
11 opinion she suffered an anoxic brain injury related to
12 septic shock?
13      A.   Yes.
14      Q.   And that was following her heart attack that,
15 again, was caused by the infection?
16      A.   Yes.
17      Q.   The last sentence of that paragraph says, "It
18 would be speculation as to whether transferring her to
19 the hospital on October 11th, 2016, after she appeared
20 to have a seizure would have changed this outcome."
21      What is that based on?
22      A.   Well, I think we don't know what would have
23 happened had she gone to the hospital, what treatment
24 would have been rendered, what investigation -- what
25 workup would have been done.

## REPORT OF JULI GARNER HORTON, M.D.

I have been engaged to review medical and jail records regarding the decedent, Angela Denise Hulsey, in this matter. I am an Infectious Diseases physician practicing in Nashville, Tennessee. I am Board Certified in internal medicine and infectious diseases. I have attached to this report a copy of my *Curriculum Vitae* with a summary of my education and medical training.

I have reviewed the following records, depositions, and other documents:

1. Medical records from Gateway Medical Center in Clarksville, Tennessee from September 30-October 1, 2016;

2. Medical records from Centennial Medical Center in Nashville from October 3, 2016;

3. Notes from Nurse Jessica Plank Treichler from October 10-12, 2016;

4. Ms. Hulsey's booking records and medical questionnaire from the Cheatham County Jail;

5. The depositions of Jessica Plank Treichler, Tia Alexis Newman, Harley Durham, and Jeremy Shivers; and

6. The expert report of Rathel Nolan, M.D.

Based on the records I have reviewed, Ms. Hulsey had staph bacteremia ("staph") caused by Methicillin-resistant *Staphylococcus aureus* (MRSA) and likely suffered from endocarditis at the time she was taken into custody on October 6, 2016. Ms. Hulsey was treated in the emergency room at Gateway Medical Center in Clarksville on September 30, 2016 for a narcotics overdose. Before leaving the hospital on October 1, 2016 against medical advice, Ms. Hulsey had a positive blood culture and had received some IV antibiotic therapy. The positive culture would have been a serious diagnosis for any patient, but it is especially serious for injection drug users because of the concern as to

EXHIBIT 2
WIT: Horton
DATE: 5/29/19

whether the patient has endocarditis. Historical studies have shown that a person diagnosed with staph bacteremia has a mortality rate of approximately 20%. On October 3, 2016, the final report from the blood culture came back as positive for MRSA. However, it does not appear that the hospital contacted Ms. Hulsey with that result because she already had been discharged.

Ms. Hulsey was seen at the emergency room at Centennial Medical Center in Nashville on October 3, 2016. She tested positive for opiates, methamphetamine, benzodiazepines, and cannabis in a urine drug screen. Although she received a work up for Bell's Palsy, based on her elevated creatinine level (3.1 mg/dL), she was in acute renal failure. Chest x-rays also revealed the presence of lower lobe pneumonia. Her vital signs were normal and she did not have a fever, but her white blood cell count was high and her platelet count was low. However, she was not admitted to the hospital and discharged.

By the time she was taken into custody on October 6, 2016, I would have expected Ms. Hulsey to look and feel sick. I would have expected her to have had several non-specific, flu-like symptoms, including fever, weight loss, shaking chills, cough, and chest pain. The symptoms of someone experiencing withdrawal often mimic these symptoms, and it can be difficult for a trained medical professional to distinguish between whether someone is suffering from withdrawal or staph bacteremia. Ms. Hulsey went to the emergency room at Centennial on October 3, 2016 while suffering from staph bacteremia and endocarditis and was diagnosed with Bell's Palsy. Ms. Hulsey's fecal incontinence was an alarming symptom, but it was not a specific symptom. With respect to her skin color, I would have expected Ms. Hulsey's skin to be clammy and pale. I would have

expected someone suffering from withdrawal to appear the same way. However, I would not have expected the color of Ms. Hulsey's skin to change to a grayish-green color as Ms. Newman testified in her deposition. The skin color Ms. Newman described is not common with someone with staph bacteremia.

With respect to Ms. Durham's testimony that Ms. Hulsey had what appeared to her to be a seizure on October 11, 2016, a seizure is not a specific finding for someone with staph bacteremia or endocarditis. I cannot say that the seizure, if that is what occurred, is related to the cause of her death.

Based on the records I reviewed, the most likely scenario is that Ms. Hulsey ended up in septic shock. She would have become hypotensive as the infection caused her blood pressure to go lower and lower, and the poor blood flow to her heart led to her cardiac arrest. She suffered an anoxic brain injury related to the septic shock. It would be speculation as to whether transferring her to the hospital on October 11, 2016 after she appeared to have a seizure would have changed this outcome.

I have testified in one deposition in the past four years in a case styled *James Cardwell v. HCA Health Services of Tennessee, Inc., et al.*, Davidson County Circuit Court No. 15C2576, but not at trial. I have not authored any publications in the past ten years. I am being compensated at a rate of $350.00 per hour for medical record review. If I testify during a deposition or at trial in this case, I will be compensated at a rate of $500.00 per hour.

*Juli Garner Horton MD*
Juli Garner Horton, M.D.

3