```
            IN THE UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF TENNESSEE
                    NASHVILLE DIVISION


MARGARET CRAIG, as next of        )
kin and personal representative   )
of the estate of Angela Hulsey,   )
                                  )
            Plaintiff,            )
                                  )
vs.                               )   No. 3:17-cv-01335
                                  )   JURY DEMAND
                                  )   JUDGE CAMPBELL
CHEATHAM COUNTY, TENNESSEE,       )   MAGISTRATE HOLMES
et al.,                           )
                                  )
            Defendants.           )
```

_____

**The deposition of**

**JESSICA (PLANK) TREICHLER**

**January 3, 2019**

_____

```
         TAMI R. WEBB, RPR, LCR, CCR
          ACCURATE COURT REPORTING
              P.O. Box 682683
            Franklin, TN  37068
         (615) 244-DEPO or 244-3376
             www.ACR-Nashville.com
```

1  Q. All right. Did you have a set of procedures,
2 though, that you would follow as opposed to protocols.
3  Tell me about your day. When you clock in at work,
4 what would you do? What was your normal job duties?
5  A. Give morning medications, come back to the office,
6 check sick calls while I requested any booking sheets from
7 the night before.
8  Q. And is that same as an intake sheet?
9  A. Yes.
10  After reviewing sick call and booking, putting
11 everyone in order to be seen for the day.
12  Q. Kind of like triage?
13  A. Yes.
14  Q. Okay.
15  A. I would complete that list of inmates' names and
16 give that to my sergeant to start clinic hours.
17  Q. And would they bring the individual to you?
18  A. Yes.
19  Q. Okay. And you had a clinic in the jail. As I
20 understand it, would that have been close to the booking
21 area?
22  A. It was in the booking area.
23  Q. Was it a separate room?
24  A. Yes.
25  Q. Okay. What was the hours of your shift?

1  A. That's correct.
2  Q. Okay. And if the answer was, "You can have
3  Band-Aids" -- but it would be the corrections officer that
4  would then take at a designated time?
5  A. That's correct.
6  Q. Okay. In terms of the booking sheets, you
7  mentioned that you would look at the ones from the night
8  before. Did you look at booking sheets as they came in?
9  A. As they were given to me.
10 Q. Okay. So if somebody was booked, they didn't
11 immediately just hand you the booking sheet; once they
12 finished their process, they might -- if you were there, they
13 might give it to you that day, and if you weren't there, then
14 they would stack up or accumulate and then you'd look at the
15 ones for the ones that you hadn't seen yet?
16 A. It was not typical for me to get them the same day.
17 Q. Okay. And was there like an inbox that you'd have?
18 A. There was a large sterile-like container drawer, if
19 you will, in the booking office that was dignified [sic], if
20 you will, as the nurse's box. And if they had anything to
21 give me, they would leave it in there.
22 Q. And so was the -- the booking sheets, I know there
23 was electronic system to record that, so that was printed out
24 and then put in your box?
25 A. That's correct.

1  orders.
2  Q.  How did you determine what would be normal for a
3  given person?
4  A.  Based on their recant.
5  Q.  Based on what they would tell you?
6  A.  Uh-huh.
7  Q.  Is that a yes?
8  A.  Yes.
9  Q.  Okay.  Is that the only thing that you would base
10 it on?
11 A.  For the immediate decision, yes.
12 Q.  Okay.  So what about the non-immediate decision?
13 A.  We would have them sign a release of records and
14 often fax to providers.  Sometimes we got records; sometimes
15 we didn't.
16 Q.  Did you ever call or consider something out of the
17 norm based on just your observations?
18 A.  No.
19 Q.  I don't think I asked this specifically so let me
20 go back.
21      As an LPN, what were your -- what's your
22 understanding of what you were permitted to do medically?
23 A.  Assess, report, follow orders.
24 Q.  And as an LPN, would you agree with me that you
25 were not permitted to make diagnosis of a patient's illness?

1  A.  I'm not a doctor; therefore, that's out of my scope
2  of practice, yes.
3  Q.  And you would agree that you were required to work
4  within your license as an LPN --
5  A.  Yes.
6  Q.  -- in providing medical care?
7  Do you know what the, I guess, average daily
8  population was at Cheatham County Jail?
9  A.  Average daily, no.  The lowest I recall, it was in
10 the 90s; the highest I recall, in the 120s.
11 Q.  Do you know if the female population was ever above
12 capacity?
13 A.  I don't know what the capacity was.
14 Q.  You talked about the booking sheet, and I think the
15 name on the document that we have is an "intake sheet" or
16 vice versa.  That's the same thing.  Is that fair to say?
17 A.  Yes.
18 Q.  Okay.  And do you agree that an intake medical
19 screening must be provided on every detainee or inmate at a
20 jail?
21 A.  Within ten days, yes.
22 Q.  I'm talking about when they're first booked.
23 A.  Within ten days.
24 Q.  So when somebody's first booked, you're saying that
25 no medical information or screening information has to be

1  then, that the physician has to be notified where an inmate
2  may be in need of medical treatment?
3           MR. DEDMAN:  Object to form.
4       A.   I would agree that the doctor needs to be notified
5  when the patient reports it's anything out of the norm.
6       Q.   (By Mr. Moseley)  All right.  What about when
7  either a staff member or somebody in your position, nursing
8  staff, observes something that is out of the norm for a
9  patient?
10      A.   That would be reported to the doctor.
11      Q.   All right.  Would you agree that any notification
12 to the doctor should be documented?
13      A.   Yes.
14      Q.   Would you agree that correctional staff must be
15 trained in early detection of illness to properly notify the
16 physician or other medical staff?
17      A.   Yes.
18      Q.   Do you agree that detoxification is done only under
19 medical supervision?
20      A.   Yes.
21      Q.   All right.  Was there a specific protocol that
22 Cheatham County Jail or QCHC followed?
23           MR. BEEMER:  Object to the form.
24      Q.   (By Mr. Moseley)  For detoxification?
25      A.   There is policies in place, but all orders were not

1  A. That would need serious attention. It's not
2  necessarily a serious condition.
3  Q. What about somebody who's drooling?
4  A. Yes.
5  Q. An inmate or detainee who is disoriented?
6  A. Yes.
7  Q. What if they are unable to speak?
8  A. Of course, yes.
9  Q. Is it a serious medical condition for somebody who
10 is suffering from a drug overdose?
11 A. Yes.
12 Q. What about somebody who's suffering from a drug
13 withdrawal?
14 A. Yes.
15 Q. What about a high or low -- higher or
16 lower-than-normal body temperature?
17 A. Fever.
18    MR. DEDMAN: Object to form.
19 A. Diagnosable fever doesn't mean it's serious.
20 Q. (By Mr. Moseley) What about high or low blood
21 pressure?
22    MR. DEDMAN: Object to form.
23 A. Doesn't mean it's serious.
24 Q. (By Mr. Moseley) Is there a point that it becomes
25 serious?

88

1  Q. If -- if you had reported a blood pressure that was
2  out of the norm, higher than the normal for her then, would
3  that be something that you would report to the doctor?
4  A. Yes, based on her symptoms also and her report.
5  Q. You mentioned the call -- and, again, I think it's
6  Mark Bryant, but that's really not the critical issue in my
7  question. I think you said that you don't recall if he gave
8  you or provided you any vital sign information.
9  A. I don't recall it right off the top of my head.
10 Q. If he did, that would be something that you would
11 have written down and would have put in your notes?
12 A. Yes.
13 Q. Okay. So if it's not in the notes, is it fair to
14 say that he did not provide you that information?
15 A. Yes.
16 Q. Okay. Would you consider a blood pressure reading
17 of 144 over 99 to be significant?
18 A. Not significant.
19 Q. Would you have felt the need to contact the
20 supervising physician if you were provided that information
21 by one of the staff members after hours?
22 A. With additional information, yes.
23 Q. What other information would you need?
24 A. The patient's complaint.
25 Q. What complaint would be required for you to contact

```
1   the doctor?
2        A.   That could be a multitude of things.
3        Q.   What if somebody said they had a headache?
4        A.   Well, yeah.
5        Q.   Okay.
6        A.   Typically high blood pressure will cause headache.
7        Q.   And is that something then you would contact the
8   doctor?
9        A.   Uh-huh.
10       Q.   Okay.  Is that a yes?
11       A.   Yes.
12       Q.   I may have asked it but I want to make sure.  Not
13  including Mark Bryant, not including what we talked about
14  with Officer Paul, do you have any recollections of any of
15  the jail staff contacting you about Ms. Hulsey's vital signs?
16       A.   Just the one call from Mark, that's all I recall.
17       Q.   Okay.  So other than that call, there were no
18  other --
19       A.   Not that I recall.
20       Q.   There was no other contact from the jail to you
21  about Ms. Hulsey?
22       A.   Not that I recall.
23       Q.   Okay.  And if there had been that contact, that's
24  something you would have logged and recorded?
25       A.   Yes.
```

1  Q. Did any of the staff at the jail tell you that they
2  believed Ms. Hulsey was detoxing or coming off drugs?
3  A. No.
4  Q. Did you have any independent belief that she may
5  have been detoxing or coming off drugs?
6  A. I repeatedly asked her.
7  Q. Did you ask because you had a belief that she might
8  have been?
9  A. I ask because I ask everyone.
10 Q. All right. You ask everyone in general or do you
11 ask every --
12 A. Yes, everyone in general.
13 Q. -- everyone who has a complaint and needs to see
14 you?
15 A. No, everyone in general.
16 Q. All right. Were there any observations you made of
17 her that made you have a belief that she may have been coming
18 off drugs?
19 A. Just questioning if she was telling me the truth
20 about her bowels.
21 Q. In what way could that be significant to whether or
22 not she was coming off drugs?
23 A. It's one -- loose stools can be a sign of detox,
24 coupled with other symptoms.
25 Q. What other symptoms?

1  A.  For example, nausea and vomiting.
2  Q.  Do you know if she had nausea and vomiting?
3  A.  She never asked -- told me she did.
4  Q.  Did you ever observe her have nausea --
5  A.  No.
6  Q.  -- or vomiting?
7      Any other symptoms?
8  A.  Perfuse sweating, goose bump skin, using the COWS
9  scale.
10 Q.  All right.  Did you ever observe her having
11 sweating or...
12 A.  No.
13 Q.  Aside from your notes, do you have an independent
14 recollection of your direct contact with Ms. Hulsey?
15 A.  I remember her.
16 Q.  Okay.  When was the first time that you had any
17 interaction with her regardless of whether it was around this
18 time or even before?
19 A.  No, the 10th.
20 Q.  Okay.  And what -- what's your first recollection?
21 A.  The conversation that I have documented.
22 Q.  So your only recollection is exactly what's in your
23 notes?
24 A.  Yes.
25 Q.  You have no other recollection of this beyond that?

```
                                                              92
 1       A.   I never knew her prior to that, no.
 2       Q.   All right.  Did you have any conversations with any
 3  of the jail staff about Ms. Hulsey and her history?
 4       A.   No.
 5       Q.   Do you know what time you first saw Ms. Hulsey on
 6  the 10th?
 7       A.   If I recollect correctly, according to my notes, it
 8  was upon my arrival, so chances are as I was walking through
 9  at 6:00 in the morning.
10       Q.   And at that time was she in booking?
11       A.   Yes.
12       Q.   So sometime around 6:00 in the morning as you had
13  arrived, you encountered Ms. Hulsey?
14       A.   Uh-huh.
15       Q.   Is that a yes?
16       A.   Yes.
17       Q.   And what prompted any type of interaction with
18  Ms. Hulsey?
19       A.   She would have probably called me to the door.
20  That was not unusual.
21       Q.   So she was in her cell?
22       A.   Yes.
23       Q.   Okay.  Was there anybody else in her cell with her?
24       A.   I'm sure there was.  I don't recall.
25       Q.   Okay.  Did you have any conversations with anybody
```

1 your notes?
2     A. Usually.
3     Q. Are there times that you wouldn't have logged that
4 in your notes?
5     A. Yeah.
6     Q. Under what circumstances?
7     A. Probably I'm human. 3:00 in the morning when
8 you're half asleep, I'm sure there were some things that were
9 occasionally missed.
10     Q. Now, I don't know of any log where they called you
11 at 3:00 in the morning so I'm not suggesting that they did
12 contact you. One of the purposes behind that question was to
13 try and find out why she's there.
14     A. I don't know.
15     Q. I don't know that I have an answer to that yet.
16     A. No, I don't know.
17     Q. I'm just trying to find out if you did.
18     Did Mark Bryant ever inform you that Ms. Hulsey had
19 suffered a seizure during her detention?
20     A. No, not that I recall.
21     Q. Did any other jail employee ever inform you that
22 Ms. Hulsey suffered a seizure during her detention?
23     A. Not that I recall.
24     Q. If you had been informed that Ms. Hulsey had
25 suffered a seizure, what would your response have been?

99

 1    A.  If it was after hours, contact the doctor; if it
 2 was during hours, see her.
 3    Q.  Would you have made the contact with the doctor or
 4 would you have the jail staff contact the doctor?
 5    A.  No, I would call the doctor.
 6    Q.  Do you know whether Ms. Hulsey reported pain at any
 7 time during her detention at the jail?
 8    A.  Not that I recall.
 9    Q.  No pain?
10    A.  Not that I recall.
11    Q.  Why did you have her on a headache protocol?
12    A.  I don't consider a headache to be pain.
13    Q.  What would you consider it?
14    A.  Discomfort.
15    Q.  So then you would agree that Ms. Hulsey reported
16 discomfort during her stay at the Cheatham County Jail?
17    A.  Discomfort, yes.  Headache.
18    Q.  Do you know whether or not she ever reported any
19 difficulty breathing during her detention at the jail?
20    A.  Not that I recall.
21    Q.  Did you ever observe her have any kind of breathing
22 difficulty?
23    A.  The day of.
24    Q.  The day of what?
25    A.  Her -- the incident on the 12th.

1  need the intake.
2          MR. BEEMER:  What are the Bates numbers?
3          MR. MOSELEY:  47, 48.
4      Q.  (By Mr. Moseley)  I just handed you two pages that,
5  I guess, purports to be the jail management intake report.
6      A.  Uh-huh.
7      Q.  We've talked about a booking sheet or intake sheet.
8  Is this what we were talking about?
9      A.  Yes.
10     Q.  Okay.  And I think you mentioned there was -- at
11 one point, you talked about initials or something?
12     A.  Uh-huh, yes.
13     Q.  So on the second page of this, there appears to be
14 a date and some initials.  So can you verify whether or not
15 those are actually your initials?
16     A.  They are.
17     Q.  Okay.  And that signified what again?
18     A.  That I had viewed the sheet.  It was my personal
19 habit just for a clue to me that I had looked at that sheet.
20     Q.  And is it fair to say that you had to request this?
21 This wasn't --
22     A.  Yes.
23     Q.  -- placed in your box?
24     A.  Yes.
25     Q.  Okay.  There are certain notations in addition to

Case 3:17-cv-01335   Document 117-6   Filed 07/03/19   Page 15 of 20 PageID #: 1050

114

1  need the intake.
2          MR. BEEMER:  What are the Bates numbers?
3          MR. MOSELEY:  47, 48.
4      Q.  (By Mr. Moseley)  I just handed you two pages that,
5  I guess, purports to be the jail management intake report.
6      A.  Uh-huh.
7      Q.  We've talked about a booking sheet or intake sheet.
8  Is this what we were talking about?
9      A.  Yes.
10     Q.  Okay.  And I think you mentioned there was -- at
11 one point, you talked about initials or something?
12     A.  Uh-huh, yes.
13     Q.  So on the second page of this, there appears to be
14 a date and some initials.  So can you verify whether or not
15 those are actually your initials?
16     A.  They are.
17     Q.  Okay.  And that signified what again?
18     A.  That I had viewed the sheet.  It was my personal
19 habit just for a clue to me that I had looked at that sheet.
20     Q.  And is it fair to say that you had to request this?
21 This wasn't --
22     A.  Yes.
23     Q.  -- placed in your box?
24     A.  Yes.
25     Q.  Okay.  There are certain notations in addition to

the back.  Inmate talkative and active.  Said would rather be
in the back where she could move around better.  I told her
as long as she is feeling well, I would let CO/sergeant know.
Visually inmate observed looking better and more active."  My
signature.

    Q.   All right.  When you say "visually inmate looked
better, more active," compared to what?

    A.   Obviously the day before.

    Q.   All right.  What was -- what were your observations
the day before about her being active or how she looked?

    A.   If I didn't write them down, I don't remember
specifically.  Obviously she was more active than the day
before.

    Q.   And do you know what time that encounter took
place?

    A.   It was probably -- and it's a guess -- but probably
as I was entering the jail that morning.

    Q.   The next entry is 10/11/16.  It says "evening."  Go
ahead and read that one for us.

    A.   "My sergeant, Mark Bryant, called.  Inmate not
feeling well.  Seems to be panicking.  Continued to have
issues with bowel movements; therefore again, brought to
booking, back to med ob.  Headache protocol used.  Will
follow up with intake."

    Q.   All right.  What, if any, information can you

Case 3:17-cv-01335  Document 117-6  Filed 07/03/19  Page 16 of 20 PageID #: 1051

```
                                                              121
```

1  provide about the conversation?  Do you have an independent
2  recollection of that phone call?
3      A.   No.
4      Q.   What did it mean to you when he said that she
5  seemed to be panicking?
6      A.   That's unfortunately a normal part of anxiety in
7  jail life.
8      Q.   And the "continued to have issues with bowel
9  movements," what significance was there to that for you?
10     A.   Well, that's why she was brought back up is
11 because, per that recant, she had had bowel issues, so
12 therefore, she was brought back to med ob.
13     Q.   Per the statement by Mark Bryant?
14     A.   Uh-huh.
15     Q.   Is that a yes?
16     A.   Yes.
17     Q.   And then this last notation, "headache protocol
18 used."  Why was the headache protocol used?
19     A.   I would have to look at the headache protocol to
20 tell you that.  This was just a general addendum to any notes
21 that were taken.
22     Q.   Okay.  And all of that took place, it says
23 "evening," so is that after your shift was over?
24     A.   That's correct.
25     Q.   Okay.

```
 1      A.   Chances are I didn't jot down a time when I made my
 2   notes at home.
 3      Q.   Okay.  Would you have started the headache protocol
 4   that evening then?
 5      A.   Uh-huh.
 6      Q.   Is that a yes?
 7      A.   Yes.
 8      Q.   Okay.  So you would have instructed Mark Bryant to
 9   use the headache protocol?
10      A.   Well, I would have instructed him what medication
11   to give according to the protocol.
12      Q.   Okay.  So you would have simply -- and I think in
13   this case it was Tylenol or something.
14      A.   Yes.
15      Q.   But whatever it was, you would have simply said,
16   give her such and such milligrams of Tylenol?
17      A.   Yes.
18      Q.   And then we have the next page, which has a date
19   and time, 10/12/16 at 8:30 a.m.  Is that correct?
20      A.   That's correct.
21      Q.   What's the plus or minus?
22      A.   Approximate, in other words.
23      Q.   Approximate, okay.
24      A.   Yeah.
25      Q.   When would you -- before we have -- before I have
```

Case 3:17-cv-01335   Document 117-6   Filed 07/03/19   Page 18 of 20 PageID #: 1053

1  actually, in fact, had a bowel movement?
2      A.   No.
3      Q.   You put in here, "Rerequested booking sheet for
4  inmate of Corporal Moore"?
5      A.   Uh-huh.
6      Q.   Is that because you had requested it the day before
7  and it had not been provided?
8      A.   That I had requested it at some point and hadn't
9  been provided.
10     Q.   I think we went over your nurse's notes that you
11 had requested it the day before, and so I'm assuming you had
12 not been provided it that day.
13     A.   At that point.
14     Q.   You say, "Advised inmate will do intake after she
15 has completed shower."  Is that the assessment, you mean?
16     A.   No.  If you look at the whole sentence:
17 "Rerequested booking sheet for inmate of Corporal Moore to
18 follow up with intake to get better idea of what is happening
19 with inmate and advised inmate will do intake after she has
20 completed shower."
21     Q.   She had already had the intake done at this point?
22     A.   My intake.
23     Q.   Is that your assessment?
24     A.   Yes.
25     Q.   Okay.  You have, "It was noted that inmate did

1  Q. Other than the headache protocol given to Mark
2  Bryant, you're not aware of any other, for lack of a better
3  term, medical care or any kind of medical services provided
4  by any of the staff at the Cheatham County Jail, excluding
5  yourself?
6  A. No.
7  Q. And you're not aware of any other times that
8  Ms. Hulsey's vital signs were taken by anyone other than
9  yourself?
10  A. Yes.
11  Q. Is that correct?
12  A. Yes, that's correct.
13  Q. In some of the interrogatory responses, there were
14  references made to the National Commission of Correctional
15  Healthcare. That's the organization that you received your
16  certification from. Correct?
17  A. That's correct.
18  Q. Did you actually refer to any of the guidelines in
19  providing care to Ms. Hulsey?
20  A. Not directly, no.
21  Q. I think it was also mentioned about the Tennessee
22  Correctional Institute. Are you even familiar with any of
23  the healthcare guidelines in the Tennessee Correctional
24  Institute?
25  A. TCI, is that who you are...

ACCURATE COURT REPORTING (615) 244-DEPO OR 244-3376
Case 3:17-cv-01335  Document 117-6  Filed 07/03/19  Page 20 of 20 PageID #: 1055