IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


MARGARET CRAIG, as next of      )
kin and personal representative )
of the estate of Angela Hulsey, )
                                )
            Plaintiff,           )
                                )
vs.                             )   No. 3:17-cv-01335
                                )   JURY DEMAND
                                )   JUDGE CAMPBELL
CHEATHAM COUNTY, TENNESSEE,      )   MAGISTRATE HOLMES
et al.,                         )
                                )
            Defendants.          )

_____

**The deposition of**

**JOHNNY J. HANNAH**

**November 6, 2018**

_____




TAMI R. WEBB, RPR, LCR, CCR
ACCURATE COURT REPORTING
P.O. Box 682683
Franklin, TN  37068
(615) 244-DEPO or 244-3376
www.ACR-Nashville.com

Case 3:17-cv-01335    Document 117-7    Filed 07/03/19    Page 1 of 25 PageID #: 1056

1  of the jail, an officer should notify the shift supervisor

2  immediately?

3      A.   Yes, that conforms.

4      Q.   Is that the type of thing that would be logged?

5      A.   Not necessarily, no, sir.

6      Q.   I noticed in the -- in the records in this case

7  there's a lot of bowel movements apparently that Ms. Hulsey

8  had.  Is that significant enough that would require the

9  logging either the booking log or some other type of notation

10 somewhere?

11     A.   If somebody felt that it was out of the ordinary,

12 which it is out of the ordinary, then yes, they would --

13 should have logged it.

14     Q.   Correctional officers must attend to the care and

15 well-being of sick detainees?

16          MR. BEEMER:  Object to the form.

17     A.   I don't think that we would necessarily attend to

18 them.  We'd make sure that the medical professional attended

19 to them.

20     Q.   (By Mr. Moseley)  An officer who believes that a

21 detainee is withdrawing or detoxing from drugs or alcohol

22 must report that information to medical staff immediately?

23     A.   Yes, that conforms.

24     Q.   How would that communication take place?

25     A.   Anytime somebody comes in drunk, high, on anything,

1  we would call the nurse and let her know what's going on.

2      Q.   Is that the type of significant incident that would

3  be logged?

4      A.   Any time they call the nurse, it should be logged,

5  yes, sir.

6      Q.   So any time a nurse gets called, then the officer

7  who makes the contact should log that?

8      A.   Should, yes.

9      Q.   While a detainee is in medical observation, a

10 detainee's vital signs should be taken regularly?

11          MR. BEEMER:  Object to the form.

12          MR. USERY:  Join.

13     A.   We wouldn't -- we wouldn't take the vital signs

14 unless we talked to the nurse and the nurse told us to.

15     Q.   (By Mr. Moseley)  All right.  Are there any

16 incidents where an officer will take vital signs?

17     A.   We would take -- if we called the nurse and she

18 asked us to get the oxygen level and the blood pressure,

19 because those are two unskilled labors I guess you could say,

20 that's the only thing that we would be skilled enough to do.

21     Q.   All right.  What about taking somebody's

22 temperature?

23     A.   We could possibly do that.  I'm sorry, I forgot

24 about that.

25     Q.   I was hoping that was unskilled.

1  dangerous medical conditions that could threaten the life or
2  health of a detainee?
3            MR. BEEMER:  Object to the form.
4            MS. WILLIAMS:  Same.
5            MR. USERY:  Join.
6       A.   We are not medically trained at all, so...
7       Q.   (By Mr. Moseley)  All right.  Officers cannot
8  assume that a symptom is for a condition that is not serious
9  if it can also be a symptom for a serious condition?
10            MR. BEEMER:  Object to the form.
11            MS. WILLIAMS:  Same.
12       A.   One more time, please.
13       Q.   (By Mr. Moseley)  Officers cannot assume that a
14  symptom is for a condition that is not serious if it can also
15  be a symptom of a serious condition?
16            MR. BEEMER:  Object to the form.
17       A.   We wouldn't -- we wouldn't -- we don't have any
18  medical training so we wouldn't know anything about if a
19  symptom was serious or not serious.  We would get our advice
20  from the medical professional that we hired.
21       Q.   (By Mr. Moseley)  How would an officer know whether
22  or not a detainee or inmate is sick enough to report it to
23  the nurse?
24       A.   Common sense is going to come into play at some
25  point in time.  If they're bleeding, if they're throwing up,

1  if they're -- if it's somebody you see on a regular basis,

2  which we do, and they're acting out of character, then you

3  should tell somebody, your supervisor at the very least, and

4  the supervisor should go back and check out things.

5      Q.   All right.  Let me go down a list of things that

6  may fall under that, and if that's something that would be

7  considered as a symptom at least that should be reported to

8  the nurse for the nurse then to decide what to do.

9          If an inmate is very weak.

10     A.   Depends on the way the inmate looks and acts.

11 Other than him just saying that he's very weak.  Because I

12 could say I'm very weak, how do you know then?

13     Q.   You don't look very weak, but...

14     A.   It depends on -- on your interactions with them I

15 guess you would say.

16     Q.   So observations in addition to any kind of

17 verbal --

18     A.   Yes, sir.

19     Q.   -- statements?

20         Okay.  What about somebody who appears barely able

21 to walk or needs to have assistance to be able to walk?

22         MR. USERY:  Object to form.

23     A.   Again, it's all subjective.  I mean you'd have to

24 be there to see it.  But, I mean, if -- if you legit think

25 they can't walk, then yes, that would be one that you'd call

1  the nurse about.

2      Q.   All right.  What about having difficulty breathing?

3      A.   Again, that's another subjective thing.  But if you

4  were there and they appeared to be legitimately having a

5  problem, then yes, you would call the nurse.

6      Q.   All right.  Being in obvious pain?

7      A.   Then yes, if --

8      Q.   Because pain's subjective.

9      A.   -- if they're in obvious pain or agony, you would

10  call the nurse.

11     Q.   Okay.  We talked about -- earlier about the losing

12  control of one's bowels.  Is that something that's

13  significant enough that the nurse should be called?

14     A.   That's 50/50 in my opinion.  I'd probably contact a

15  nurse.  But would you necessarily contact a nurse any time

16  somebody -- let's say in booking.  Let's make a scenario

17  there in booking.  And they're going through DTs, they a lot

18  of times do that kind of stuff.

19     Q.   All right.

20     A.   So that alone, no, I maybe wouldn't call the nurse.

21     Q.   Let me add this to that scenario then:  How about

22  frequent losing control of bowels?

23     A.   Yes, I would call the nurse.

24     Q.   So if it happened over a period of days, that would

25  be something that was significant enough that needed to be

1  brought to the nurse's attention?

2      A.    You would be worried about dehydration and stuff

3  like that.

4      Q.    What about if an officer actually observes somebody

5  having a seizure?

6      A.    It depends on if they have a history of seizures.

7  But you would contact a nurse.  No matter what, you'd contact

8  a nurse and do what she tells you.

9      Q.    What about somebody suffering from a drug overdose?

10     A.    That would be an emergency and you'd probably call

11 911 to get an ambulance.

12     Q.    All right.  What about suffering from drug

13 withdrawal?

14     A.    You would contact a nurse about any kind of drug

15 issue.

16     Q.    That's the detox situation?

17     A.    Yes, sir.  Yes, sir.

18     Q.    Okay.  What if somebody has a high or even a low

19 temperature?

20          MR. USERY:  Object to form.

21     A.    Basically -- normally you wouldn't take anybody's

22 vital unless you had the nurse's blessing, "Hey, do this for

23 me."  Because, again, we're not medical professionals --

24     Q.    (By Mr. Moseley)  Sure.

25     A.    -- we wouldn't know what to do about anything.

1  medical.

2      Q.   When you say "FTO," field training officer?

3      A.   Yes, sir, field training officer.

4      Q.   Okay.  So there's nothing in any of the training

5  materials that the county provides in that, what is it, 24

6  hours a year, that includes anything involving either medical

7  conditions or health-related conditions?

8           MR. BEEMER:  Object to the form.

9      A.   Basic CPR and first aid, that's the only medical

10 training we have at all.

11     Q.   (By Mr. Moseley)  Who provides the CPR and the

12 first aid training?

13     A.   We use different people.  In the past, we've used

14 our local fire department that were certified to teach us CPR

15 and first aid.  QCHC now provides both of those services for

16 us.

17     Q.   And I may have a question about this later, but

18 since we're talking about it.  I did notice in the agreement

19 with the QCHC -- I think I saw that QCHC where it says "QCHC

20 will also provide annual CPR, first aid, and other training

21 for staff at the jail as determined by the Sheriff and QCHC."

22     A.   Yes, sir.

23     Q.   So that's the reference you were talking about --

24     A.   Yes, sir.

25     Q.   -- that they provide that.

1  question I ask?

2      A.   It would be documented with TCI and through the

3  portal and they would keep track of the training stuff.

4      Q.   So there's an electronic portal --

5      A.   Yes, sir.

6      Q.   -- that would keep track of that training?

7      A.   Yes, sir.

8      Q.   Okay.  How long is that course, the CPR course?

9      A.   It was either four or eight hours, I'm not a

10 hundred percent sure.

11     Q.   So it qualifies for either four or eight of the 24

12 hours --

13     A.   Yes, sir.

14     Q.   -- that was provided?

15          Okay.  That's not part of the 16 hours that the

16 State provides.  Is that accurate?

17     A.   No, sir.  Yes, sir, that's accurate.

18     Q.   Okay.  We talked about this a little bit, but let

19 me ask the question this way:  What type of training, if any,

20 is given then to corrections officers or jailers in

21 recognizing that a detainee or inmate is in need of medical

22 help?

23     A.   There's no kind of medical training at all.  I mean

24 common sense is what it is.

25     Q.   And common sense isn't always common but --

1    A.    Yes, sir.

2    Q.    -- I'm going to ask the question this way:  Is

3  there an actual course or any of the training that's given

4  where the employees are specifically told, "Use your common

5  sense, if you see somebody who's in need of medical care or

6  is ill, contact the nurse"?

7    A.    When we do the orientation when I hire people, I

8  explain to them, I tell them, "Anything out of the ordinary,

9  make sure you report to your supervisor."

10    Q.    All right.

11    A.    "Anybody -- when somebody's sick, make sure you

12  tell your supervisor about it."

13    Q.    And the annual training that's given, is that -- do

14  you go over that again or is that just all part of the

15  initial orientation?

16    A.    It's part of the initial orientation for sure.

17  Depends on -- we kind of let our needs steer where our

18  training goes for the year.  So, I mean, one year we might

19  not necessarily do it and the next year there might be a

20  problem so we need to hit it again and make sure everybody

21  understands it.  Plus we have such a high turnover rate that

22  it's -- you're constantly telling people about it.

23    Q.    Okay.  When somebody is placed into medical

24  observation, what training is given for the staff to make

25  observations?  What are they told to do with somebody in

1 medical observation?

2     A.   You want to make sure that they're breathing and

3 they don't appear to be in any kind of distress.

4     Q.  And I want to make sure I'm asking it -- the answer

5 I'm getting is to the question that I think I'm asking.

6         Is there actual training as part of either the

7 initial training or any of the annual training where the care

8 of detainees or inmates in medical observation, the

9 procedures and policies that the --

10     A.   There's no real training, no, sir.

11     Q.  Okay.  Assume for me that an employee comes in and

12 they don't have common sense.  How do they know what they're

13 supposed to do in the care of an inmate or detainee that's in

14 medical observation?

15     A.   We would have a senior officer that would be

16 working with them.  We wouldn't put the newest person there

17 looking over a sick person.  We'd have somebody that knew

18 what was going on that proved they had common sense.

19     Q.  Okay.

20     A.   And there would be a lot of on-the-job training, so

21 the newest learning guy would be with the more senior guy

22 learning how to do that.

23     Q.  Okay.  So is it fair to say, first off, there's not

24 a specific policy or procedure that says this is how you

25 monitor somebody in medical observation?

1    A.    Short of the time that you had to observe them, no,
2    sir.
3    Q.    Okay.  And then in order for them to know how to
4    monitor somebody in medical observation, it's on-the-job
5    training.  Is that fair to say?
6    A.    Basically.  And according to whatever our nurse may
7    have told us to do, anything special.
8    Q.    Okay.  Follow the instructions of the nurse?
9    A.    Follow the instructions --
10   Q.    Okay.
11   A.    -- of the nurse.
12   Q.    Is there any testing that's given at the end of any
13   of the training sessions, whether it be the initial training
14   or the annual testing, to make sure that the training that
15   was given actually sunk in?
16   A.    There should be a test after every training class,
17   whether it be verbal or written.
18   Q.    Okay.  Is there a pass/fail?  If somebody fails it,
19   they have to retake, or is that...
20   A.    It is a pass/fail but nobody's going to fail the
21   test that we take because you're just covering information
22   and they're very basic questions.
23   Q.    All right.  I think I know the answer to this but
24   let me just ask it just to, I guess, eliminate some things.
25   Sometimes that's the purpose of a deposition like this.

1          Is it fair to say that there's no training that's

2  given to any of the officers or the jailers specific --

3  specifically related to allowing them to recognize if

4  somebody may have sepsis?

5      A.    Yes, sir, there's no training.

6      Q.    Same with pneumonia?

7      A.    Yes, sir, there's no training.

8      Q.    Or if somebody has the flu, or influenza?

9      A.    No training.

10      Q.    Okay.  What about drug intoxication?

11      A.    There's no official training.  You learn that on

12  the job as you're going.  You have to actually see it to be

13  able to recognize it.

14      Q.    All right.  What about -- same thing with drug

15  withdrawal?

16      A.    Same thing, you have to be able to see it to be

17  able to recognize it.

18      Q.    All right.  And what about a drug overdose?

19      A.    I think -- that's -- that's definitely common

20  sense.  If somebody has come in and they all of a sudden stop

21  breathing or something like that, then...

22      Q.    But there's no specific training about --

23      A.    There's no -- I'm sorry.  No, sir.  No, sir.

24      Q.    All right.  Would you agree that if an officer or

25  jailer is unable to recognize or, in your words, doesn't have

1  knowledge goes.

2      Q.   (By Mr. Moseley)  All right.  I know you've been

3  with the county a long time, but how many other inmates have

4  either died or become nonresponsive at Cheatham County Jail,

5  say, in the ten years before Ms. Hulsey?

6          MR. USERY:  Object to form.

7      A.   We -- we have one I know that came in that was --

8  they had gave fentanyl to that they didn't tell us -- or not

9  fentanyl -- Narcan to that they didn't tell us about.  And I

10 want to say that's the only one other than Ms. Hulsey.

11     Q.   (By Mr. Moseley)  All right.  And what would be the

12 significance of telling you whether or not somebody was

13 provided -- you said Narcan?

14     A.   Yes, sir, it's a drug counteragent.

15     Q.   I think I know what it is.  But what would be the

16 significance in your mind of being told that?

17     A.   Because they -- they -- at the very least, we would

18 have watched them even closer, but they would have -- they

19 should have been took to the hospital.

20     Q.   And when you say "they," who is it that should

21 have -- who brought him in -- the person in that...

22     A.   I think he was arrested by a state trooper and the

23 paramedics came in with him.

24     Q.   All right.  Do you know when that was?

25     A.   I do not know a specific date.  I'm sorry.

1      Q.   I may have some information about that.  Would that

2 have been back in July of 2013?  Does that sound...

3      A.   Should be close to that.

4      Q.   And was that an individual by the name of Michael

5 Floyd?

6      A.   I think the individual's name was Chizum Whaley.

7      Q.   Chizum Whaley?

8      A.   But I'm not a hundred percent sure on that.

9      Q.   How would you find out and determine the

10 individual?

11     A.   I'd have to go back and check my files.

12     Q.   All right.  Do you know if a lawsuit ever got filed

13 as a result of that incident?

14     A.   Not that I know of, no, sir -- wait a minute.  I'm

15 sorry.  Maybe there was and it was settled.

16     Q.   You didn't give a deposition in that case

17 obviously?

18     A.   I did not, no, sir.

19     Q.   All right.  Do you know if there's a problem or

20 some type of outbreak of scabies at the jail at the time that

21 Ms. Hulsey was in custody back in October 2016?

22     A.   I don't know if it was at that specific time, but

23 we have had an outbreak of scabies, yes, sir.

24     Q.   All right.  I guess my question is going to be:  Do

25 you know if there was any taxing of the medical services back

```
 1  in October of 2016 because of some outbreak or problem with
 2  scabies?
 3          MR. USERY:  Object to form.
 4      A.   I don't know that there would have been any kind of
 5  taxing.
 6      Q.  (By Mr. Moseley)  Okay.
 7          MR. BEEMER:  Was it "taxing"?
 8          MR. MOSELEY:  Taxing.  Cause a...
 9          MR. USERY:  Stress.
10          MR. MOSELEY:  Yeah, cause stress on -- on the
11  ability --
12          MR. BEEMER:  Okay.
13          MR. MOSELEY:  -- to provide medical services.
14          MR. BEEMER:  Okay.  All right.
15          MR. MOSELEY:  Not levy a tax.
16          MR. BEEMER:  Yeah, okay.
17          MR. MOSELEY:  Don't know how you tax a scaby.
18      Q.  (By Mr. Moseley)  Were there any changes that were
19  made after an incident involving Joel Long?  That was an
20  incident involving a detainee who was severely beaten and not
21  provided medical care until -- and this was under former
22  sheriff, Holder, until the Sheriff was confronted by a
23  General Sessions Judge?
24      A.   Any changes?  What do you mean?
25      Q.  (By Mr. Moseley)  To the policies and procedures in
```

1 how to provide medical care to detainees?

2     A.   Not that I -- no, sir.

3     Q.   Are you aware of that incident?

4     A.   I am aware of that incident.

5     Q.   You didn't have any personal involvement in that

6 incident, did you?

7     A.   No, sir.

8     Q.   Okay.  I'm going to hand you some logs that we've

9 been provided.  I don't know that they're in specific order.

10 But they're observation cell records, medical watch inmate

11 activity logs.  And what I'm trying to do is determine who

12 these initials belong to.  So that's really the purpose of

13 providing this to you, if you can identify any of those.

14     A.   I want to say we turned one over where they were

15 all identified.

16     Q.   I'm talking about on a specific line-by-line basis.

17 I'm sure we've been given a list of all the employees who

18 have been there, but a name and an initial is not always

19 easily identifiable for me, so...

20         MR. USERY:  Is there a Bates number?

21         MR. MOSELEY:  There is.  At the very bottom, you

22 can refer to the Bates number page, and that way...

23         MR. BEEMER:  Hulsey 67.

24         MR. MOSELEY:  We'll just go one by one.  That's

25 probably the easiest thing to do so.

          Q.   (By Mr. Moseley)  So the first page we're going to
look at is Hulsey 67, you said?

          A.   Yes, sir.

          Q.   Okay.  And then, if you can, identify the initials.
If it's the same initials, we don't have to worry about it.
But if you can identify the initials of who made the
notation.

          A.   TB, I'm assuming that's Tosha Biggs maybe.

          Q.   Okay.

          A.   That's what I'm saying.  I thought we gave one of
these where we identified all these over.

          Q.   I don't think I've received that.  That may have
been something that you provided to your attorney to help
them identify it.

              But if you're saying that you could provide that,
then maybe my question is -- instead of sitting here and
going through all that -- is that something that you guys can
agree to produce, a separate document that has the initials
identified for us?  Otherwise, I'm going to have to go
through each one of these and ask you for it.

              MR. BEEMER:  So you want him to decipher who the
initials are?

              MR. MOSELEY:  That's the only way I know of
figuring out who these people -- who these initials belong
to.  If you've got a better way, I'll gladly adopt it.

1      A.   I mean, I can't 100 percent tell you for sure
2  whose any initials are.  I'd have to go back and check and
3  see who was working those days.

4      Q.   (By Mr. Moseley)  All right.  Is there -- is there
5  somebody -- obviously the importance of having somebody
6  initial an activity is because they're acknowledging that
7  they're the person that did it and they would be the person
8  then who might have the information related to that incident
9  or event or whatever was being logged in.

10      A.   Yes, sir.

11      Q.   So is that something that you can provide to us
12  then so that we can identify who these individuals are?

13      A.   I'm not 100 percent sure when we started doing it,
14  but the nurse was provided with a copy of their signature and
15  their initials so they could decipher who it is.

16      Q.   Okay.  So there may be a document that has the
17  initials, sort of like a deciphering this initial is going to
18  be this person?

19      A.   Yes, sir.

20      Q.   Okay.

21          MR. MOSELEY:  Jeff, let me ask you then.  Again, I
22  don't want to waste time but I need to be able to identify
23  who these initials belong to.  That may be the best way of
24  doing it is to produce that Rosetta Stone, if you would.

25          MR. BEEMER:  Do you still have that document that

1  was given to the nurse?

2        THE WITNESS:  It should be in the nurse's files.

3        MR. BEEMER:  But do you still have a copy of it,

4  though?

5        THE WITNESS:  I don't personally have it.  She

6  would have been the one that would have kept it.

7        MR. BEEMER:  Okay.

8     A.   I mean I can tell you who I think they are but that

9  doesn't necessarily mean --

10        MR. MOSELEY:  That's better than who I think they

11  are is the issue.

12        Let's -- let's go off the record for a second.

13        (An off-the-record discussion occurred.)

14     Q.   (By Mr. Moseley)  Okay.  So then let's do this:  Go

15  back to the -- the first page and identify it simply by the

16  Bates number, identify the initial that you see, and I

17  understand it's going to be your best guess and there may be

18  mistakes there, but do the best you can and tell us who the

19  initial belongs to.

20        MR. BEEMER:  Okay.  We're looking at Hulsey 67.

21  Start there.

22     Q.   (By Mr. Moseley)  And if it helps to look at

23  another page, because we talked about during the break that

24  there's a medical watch list that is strictly kept by the

25  jail and then there's an observation cell record which is a

1 form that's provided by the medical contractor, if it helps

2 to compare two different pages, just tell us which page

3 you're looking at with the Bates number at the bottom and

4 then we can go through it that way. Does that make sense?

5     A.    Yes, sir.

6     Q.    Okay.

7     A.    So on Hulsey 066 -- 0069, the first name is Josh

8 Marriott.

9     Second name is -- I'm not a hundred percent sure

10 who the second name is.

11     Third name is Jeffrey Goad.

12     Fourth name is Jeffrey Goad.

13     Fifth name, I'm not a hundred percent sure.

14     Looks like the sixth name may be Harley Gerow.  I

15 can't see her last name.

16     Q.    That's G-E-R-O-W?

17     A.    G-E-R-O-W, yes, sir.

18     Sixth name, I'm not a hundred percent sure who that

19 name is.

20     Seventh name is Roger Thompson -- or Roger Temple,

21 I'm sorry.

22     And the last name on that page would be -- I want

23 to say that's Kevin Myers.

24     Q.    And is the information -- or at least the log

25 entries -- similar between 67 and 69?  I'm talking about the

1  Bates numbers.  Or maybe I misheard.

2       A.    This one is 0069, the one I just read to you.

3             This is 0067.

4       Q.    Okay.

5       A.    That's the -- that's the 10th for one hour, and

6  that's the 10th for the morning of.

7       Q.    Okay.  That's the first shift then?  So 67 will

8  correspond to the first shift?

9       A.    Yes, sir.

10      Q.    Okay.  So if you're on that one you can go ahead.

11      A.    The first name is Tosha Biggs, I believe.

12            Second name, third name, fourth name, fifth name,

13  sixth name, seventh name I cannot make out.

14            The eighth name is Tosha Biggs.

15            The ninth name I can't make it out.

16            And the tenth name is Tosha Biggs.

17      Q.    All right.

18      A.    I believe this is 0056, yeah.

19      Q.    Does that have a date and a shift number?

20      A.    It's got "10/10 second shift."

21      Q.    Does that correspond with the 69 that you already

22  looked at?

23      A.    Yes, sir.

24      Q.    Are there any individuals that's different or can

25  you make out any individuals that you weren't able to make

1  out before due to the difference in the log?

2      A.   No, sir, it looks like the same ones.  I still

3  can't make out some of them, though.

4      Q.   Okay.

5      A.   0057, you've got Josh Marriott is the first one;

6  Jeffrey Goad is the third one; Jeffrey Goad is the fourth

7  one; Jeffrey Goad is the fifth one; looks like Harley

8  G-E-R-O-W is the sixth one; Roger Temple is the seventh one;

9  and I can't make out the last one.

10          0070, 10/10/2016:  I cannot make out any of these.

11          0058, I can't make out any of these with certainty

12  either.

13          0071, that was a one-hour period on 10/11.  I can't

14  make out who that is.

15          10/11 from 2200 to 10/12 at 0510, it looks like the

16  same person did all the checks but I can't make out who it

17  is.

18          Ten -- I'm sorry, I'm not reading the number.

19          0062, 10/11/2016 from 2200 to 5:10, again done by

20  the same person, but I'm not a hundred percent sure who the

21  name is.

22          0074, 10/12, 0600 to 10/12 9:10:  Again, I can --

23  can't make out the names.

24          0064, 0600 -- 10/12/2016, 0600 to 10/12/2016 0910,

25  I cannot make out the names.

1    MR. MOSELEY:  All right.  We'll go ahead and make
2  that -- I think we're on 2, and I'll just call it a
3  collective exhibit.
4                    (Observation Cell Records and
5  Medical Watch Inmate Activity Logs for Angela Hulsey marked
6  Collective Exhibit 2 to this deposition.)
7    Q.    (By Mr. Moseley)  I want to make certain that -- I
8  know you -- I think you've told me this but I don't know if I
9  asked you a specific question about it so I want to make sure
10 I've got it covered.
11     Other than instructions that are provided directly
12 by a nurse or maybe even a doctor, I guess, by the medical
13 contractor, none of the Cheatham County staff would provide
14 any kind of medical care to an inmate or detainee.  Is that
15 right?
16    A.    Unless it was some kind of emergency, CPR.  We're
17 trained --
18    Q.    Okay.
19    A.    We're certified in CPR.
20    Q.    Okay.  So other than CPR, there's no other medical
21 care that would be provided by Cheatham County staff unless
22 it's directed by the nurse or the doctor?
23    A.    Yes, sir.
24    Q.    Okay.  And in terms of the vital signs, if a staff
25 member took a detainee's vital signs, would that have to be

1 as a result of being instructed to do so by a nurse or a
2 doctor?

3      A.    It should be.  We would have no reason for us to
4 take it just from our own account because we wouldn't know
5 what to do with it to begin with.

6      Q.    Okay.  If there's a log entry that shows that one
7 of the jailers or officers took Ms. Hulsey's blood pressure
8 or took some vital signs, should there be some corresponding
9 instruction from the nurse?

10      A.    Not necessarily.  What they should do and what they
11 do sometimes are a couple different things.

12      Q.    Okay.

13      A.    There could have been somebody that took their
14 vitals just on their own account.

15      Q.    Okay.

16      A.    But I don't know what they would have done that
17 for.

18      Q.    Okay.  If they did -- if a -- if a jailer or
19 officer took someone's vital signs and it showed, let's say,
20 hypertension, high blood pressure, what should they do with
21 that information?

22      A.    Well, if they knew for certain that there was some
23 kind of issue going on, they definitely should have told the
24 nurse.  But short of somebody having high blood pressure
25 themselves, nobody -- nobody's trained from the county to be